Bertha **HECHT**, Plaintiff, Appellee and Appellant,

v.

**HARRIS, UPHAM & CO.**, a partnership, Harris, Upham & Co., Inc., a corporation, Defendants, Appellants and Appellees.

**Nos. 22971, 23017.**

United States Court of Appeals, Ninth Circuit.

June 8, 1970.

As Modified on Denial of Rehearing Sept. 4, 1970.

Emanuel Becker (argued), New York City, Thomas A. H. Hartwell, of Cooley, Crowley, Gaither, Godward, Castro & Huddleson, San Francisco, Cal., E. C. Mahoney, Burlingame, Cal., for appellant.

Donald F. X. Finn (argued), New York City, Reed H. Bement, Morris Lowenthal of Lowenthal & Lowenthal, San Francisco, Cal., for appellees.

Before MERRILL and DUNIWAY, Circuit Judges, and POWELL, District Judge.*

POWELL,** District Judge.

The cross appeals by Harris, Upham & Co., Harris, Upham & Co. Inc. (appel-

---

\* The Honorable Charles L. Powell, United States District Judge for the Eastern District of Washington, sitting by designation.

\*\* Disagreement has developed in the court upon the issue of damages necessitating a separate opinion for the court upon that subject which follows the opinion of Judge Powell. The court is in agreement upon Judge Powell's opinion.

lants), and Mrs. Bertha Hecht (appellee) are from a judgment of the District Court awarding appellee $504,391.02. The opinion of the District Court is reported at 283 F.Supp. 417 (1968). The basic facts of the case are set forth there.

In January 1955 Mr. Hecht died leaving an estate of securities to his wife, the appellee, of a net value of $508,532.-00. Shortly after Mr. Hecht's death, but before distribution of the estate, a close business and social relationship was formed between Mrs. Hecht and an investment broker, Mr. Asa Wilder (codefendant below). Mrs. Hecht transferred her separate securities account (net value $42,000) from Walston & Co. to Hooker & Fay, with whom Wilder was then employed. When her husband's estate was distributed to Mrs. Hecht it was likewise placed with Hooker & Fay. In May 1957 Wilder left Hooker & Fay to become a Representative and Commodities Manager of Harris, Upham & Co. at their San Francisco office. The Hecht account, valued at about $533,161.00, was then transferred to appellants.

The account remained with Harris, Upham & Co. until March 1964 when Mrs. Hecht's tax consultants advised her that the account was substantially depleted. At that time the account had a net value of about $251,308.00. Suit was later commenced in District Court against Wilder and Harris, Upham & Co. and others for alleged violations of Section 17(a) of the Securities Act of 1933 (15 U.S.C. § 77q(a); Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b); Rule 10b-5 promulgated by the Commissions; (17 C.F.R. 240.10b-5); and the Commodity Exchange Act of 1936 (7 U.S.C. § 1 et seq.). Appellee also alleged violations of the Rules of the National Association of Securities Dealers and the common law

of the State of California. Liability of Harris, Upham & Co. was alleged under Section 20(a) of the Securities Exchange Act (15 U.S.C. § 78t(a)).

Appellee advanced three theories for recovery, (1) the account was fraudulently converted from a blue chip investment account to a low grade speculative securities and commodity trading account, (2) Wilder excessively traded the account for the purpose of generating commissions, and (3) Wilder defrauded appellee by self-dealing in two securities transactions designated as Colonial and Itek. Damages were alleged to be in excess of $1,109,000.

The District Court ruled that Mrs. Hecht was guilty of laches, had waived certain of her rights and was estopped from asserting the wrongful conversion of her account. On the issue of excessive trading, referred to as account churning, the District Court held appellee was entitled to recover all commissions deducted from her account during the period it was with Harris, Upham & Co. and all interest charged to her. Appellee was also awarded damages for the alleged fraud in the Colonial and Itek transactions. A summary of damages awarded is set forth in the District Court's opinion, 283 F.Supp. at p. 444.

## JURISDICTION

██ A District Court has jurisdiction of a private civil action for damages based upon violations of Section 10(b) and Rule 10b-5. Ellis v. Carter, 291 F.2d 270 (9th Cir. 1961); Matheson v. Armbrust, 284 F.2d 670, 673 (9th Cir. 1960); Fratt v. Robinson, 203 F.2d 627, 632 (9th Cir. 1953).

██ The District Court held that churning[1] was a violation of Section

---

1. The SEC has provided a definition of churning in the regulation under 15 U. S.C. § 78o(c) (1). See 17 C.F.R. 240.15c 1-7(a). The definition reads:
   "The term 'manipulative, deceptive, or other fraudulent device or contrivance',

as used in section 15(c) of the act, is hereby defined to include any act of any broker or dealer designed to effect with or for any customer's account in respect to which such broker or dealer or his agent or employee is vested

10(b) and Rule 10b–5. One of the principal Congressional purposes of the Securities Exchange Act is to protect the investor in a highly sophisticated field. With knowledge of this objective " * * it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose." J. I. Case Co. v. Borak, 377 U.S. 426, 433 and 435, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964); Deckert v. Independence Shares Corporation, 311 U.S. 282, 288, 61 S.Ct. 229, 85 L.Ed. 189 (1940).

Section 10(b) of the Securities Exchange Act of 1934 and Commission Rule 10b–5 make unlawful the use of any manipulative or deceptive device or contrivance by any person in connection with the sale and purchase of any security upon a national securities exchange or otherwise. Specifically, Rule 10b–5 promulgated by the Commission in 1942 provides in pertinent part that "[i]t shall be unlawful for any person, directly or indirectly, * * * (a) to employ any device, scheme, or artifice to defraud, * * * or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person * *." 17 C.F.R. Sec. 240.10b–5. Abuse of the confidence of the customer for personal gain by a broker by frequent and numerous transactions disproportionate to the size and nature of the account, has been held a violation of Rule 10b–5. Lorenz v. Watson, 258 F.Supp. 724 (E.D.Pa. 1966) extensive trading and churning of a discretionary investment account disproportionate to its size and character; Newkirk v. Hayden, Stone & Co., CCH Fed.Sec.L.Rep. para. 91,621 (S.D. Cal.1965) (churning of a discretionary trading account with an equity of $8,-439.65 by a broker who earned $2,722.-55 in commissions during a three month period). cf. Carr v. Warner, 137 F.Supp.

611 (D.Mass.1955) and its companion case Nash v. J. Arthur Warner & Co., 137 F.Supp. 615 (D.Mass.1955) (purchase and sale of securities excessive in size and frequency in view of the financial resources and character of the investors' accounts). On occasion this court has sustained the Commission's finding of churning. Irish v. SEC, 367 F.2d 637 (9th Cir. 1966) (broker advancing his own interests to the detriment of his customers by making excessive trades in their accounts). See also, Stevens v. Abbott, Proctor & Paine, 288 F.Supp. 836 (E.D.Virginia 1968) (excessive trading of an account by a broker to derive profits for himself without regard for the interests of his customer); Moscarelli v. Stamm, 288 F.Supp. 453, 457–458 (E.D.N.Y.1968) (alleged unauthorized excessive trading of securities account through broker misrepresentation).

We conclude that the issue of account churning was correctly before the District Court under Section 10(b) and Rule 10b–5.

## WAIVER, LACHES AND ESTOPPEL

This Court held in Royal Air Properties, Inc. v. Smith, 312 F.2d 210 (9th Cir. 1962) that since civil liability was judicially implied from violations of Section 10(b), estoppel, waiver and laches should be applicable. It was there stated that "[t]he purpose of the Securities Exchange Act is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act." 312 F.2d 213–214.

The District Court in the instant case found that:

"All during the course of the account, plaintiff regularly received from Harris, Upham the customary confirma-

with any discretionary power any transactions of purchase or sale which are excessive in size or frequency in view of the financial resources and character of such account."

This was relied upon in Lorenz v. Watson, 258 F.Supp. 724, 730 (E.D.Pa. 1966). See Churning by Securities Dealers, 80 Harv.L.Rev. 869 (1967).

tion slips showing each security or commodity transaction as made and requesting immediate notice of any error. She also received from Harris, Upham the customary monthly statements of her account.

It was the practice of Wilder to be in contact with plaintiff by telephone concerning her account almost every morning of the business week, and also to visit her at her home at least weekly and sometimes several times a week. Also, plaintiff would often telephone Wilder at his office during the day.

It was the practice of plaintiff to put her confirmation slips on a table in her home, 'separating the buys from the sells', in order to discuss them with Wilder. After the discussions Wilder would gather up the confirmation slips and statements and take them to his home—although he had duplicates for his own use at the office.

During the period of the account plaintiff had her own income tax accountants with whom she consulted concerning her personal tax deductions. Wilder supplied schedules to these income tax accountants, which indicated plaintiff's capital gains and losses arising out of her securities transactions. Plaintiff was also represented on occasion by attorneys—including representation by able and reputable counsel, recommended by Wilder in connection with the distribution of her husband's estate." 283 F.Supp. at p. 426.

With these facts in mind the court later concluded:

"Having, with this knowledge and understanding, permitted Wilder and his firm to continue handling the account on this basis in reliance upon her apparent acquiescence for nearly seven years, the Court finds that plaintiff's conduct is such that she is barred by estoppel, laches and waiver (within the meaning of the second appeal in Royal Air Properties, Inc. v. Smith, 9 Cir., 333 F.2d 568 (1964)) from suddenly taking the position that such trading of the account in securities

and commodities was unsuitable for her needs and objectives, contrary to her instructions and should never have occurred." 283 F.Supp. at pp. 429–430.

■ The requirements of estoppel are set out in Hampton v. Paramount Pictures Corp., 9 Cir., 279 F.2d 100, 104 (1960):

"Four elements must be present to establish the defense of estoppel: (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury." (citations omitted.)

■ To invoke laches as a defense there must be (1) a lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense. Costello v. United States, 365 U.S. 265, 282, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961). Where these elements are present, the damage to the party asserting the defense is caused by his detrimental reliance on his adversary's conduct. Royal Air Properties, Inc. v. Smith, 333 F.2d 568, 570 (9th Cir. 1964).

■ The waiver of a legal right is "the voluntary or intentional relinquishment of a known right. It emphasizes the mental attitude of the actor." Matsuo Yoshida v. Liberty Mut. Ins. Co., 240 F.2d 824, 829 (9th Cir. 1957).

Although the trial court's opinion does not specifically conclude that plaintiff intentionally relinquished a known right, it is apparent that the portion of the opinion above contains findings necessary for the application of estoppel and laches to the facts of this case.

■ To have these findings upset on appeal it must be shown that they are "clearly erroneous" within the meaning of Rule 52(a), Fed.R.Civ.P. In Clostermann v. Gates Rubber Company, 394

F.2d 794, 796 (9th Cir. 1968), it is stated:

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been committed." (citations omitted)

A review of the record does not disclose that the findings are "clearly erroneous". They will not be disturbed on this appeal.

## SUITABILITY UNDER RULE N.A.S.D.

Appellee claims the District Court erred in not holding that the National Association of Securities Dealers (N.A.S.D.), "suitability" rule (Art. III, Sec. 2,) gives rise to civil liability. Unlike the fraud requirement of the Securities Exchange Act, the N.A.S.D. "suitability" rule would, if applicable, allow recovery against a member who did not have "reasonable grounds" to believe his investment recommendation was suitable for the customer. This rule has received varied consideration from the courts. Compare Colonial Realty Corp. v. Bache & Co., 358 F.2d 178 (2nd Cir. 1966), with Avern Trust v. Clarke, 415 F.2d 1238, 1242 (7th Cir. 1969). The District Court might have entertained pendent jurisdiction over the common-law claims in which violations of Art. III, Sec. 2, might have been admissible, Mercury Investment Co. v. A. G. Edwards & Sons, 295 F.Supp. 1160 (S.D.Texas 1969), however it did not reach that question.

"In any event, we have found on the evidence in this case that plaintiff is barred by estoppel and waiver from proceeding merely upon the theory that her account, as handled by defendants was 'unsuitable' to her needs and objectives." 293 F.Supp. at p. 431.

Having affirmed the lower court's ruling on estoppel we need not decide this issue.

## EXCESSIVE TRADING

Although we have held that Mrs. Hecht is estopped to deny knowledge of the nature of the transactions in her account, we cannot say as a matter of law that she is also estopped from claiming lack of knowledge that her account was excessively traded. As viewed by the trial judge below:

"Although plaintiff had enough experience to tell from the confirmation slips and monthly statements that she was paying commissions and interest on transactions in her account [of which she had knowledge], she just did not have the sufficient competence to understand whether the frequency and volume of the transactions might be 'excessive.'" 283 F.Supp. at p. 434.

Nor does the fact the account was a trading account mean it could not be excessively traded. Newkirk v. Hayden, Stone & Co., CCH Fed.Sec.L.Rep. para. 91,621 (S.D.Cal.1965); See, Stevens v. Abbott, Proctor & Paine, 288 F.Supp. 836 (E.D.Virginia 1968).

The gist of an allegation of churning is fraud in law and differs from common law fraud. Proof of a specific intent to defraud is unnecessary. Securities & Exchange Commission v. Texas Gulf Sulphur Co., 401 F.2d 833, 854–855 (2nd Cir. 1968); R. H. Johnson & Co. v. S.E.C., 97 U.S.App. D.C. 364, 231 F.2d 523 (1956), cert. denied, 352 U.S. 844, 77 S.Ct. 48, 1 L.Ed. 2d 60; Norris & Hirshberg, Inc. v. S.E.C., 85 U.S.App.D.C. 268, 177 F.2d 228 (1949). Appellee had the burden of establishing churning by a "preponderance of the evidence".

The record before us supports the finding of the District Court that this burden was met. Many facts and circumstances disclose churning. We note only two, (1) during the period the account was with appellant there were over 10,000 trades with a gross dollar volume of approximately $100,000,000, (2) Mrs. Hecht paid commissions and markups on these transactions of about $189,000 plus interest on her margin account of about $43,000. These figures represent 4.7% of the total income of the San Francisco office of Harris, Upham

& Co., on an account of less than ⅒th of 1% of all accounts in that office.

■ When, as in this case, a single fraudulent scheme involves both securities and commodities a District Court is entitled to award damages for the entire loss. Errion v. Connell, 236 F.2d 447, 454 (9th Cir. 1956); Goodman v. H. Hentz & Co., 265 F.Supp. 440, 445 (N.D.Ill.1967); Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 253 F.Supp. 359 (S.D.N.Y.1966).

■ The District Court held Harris, Upham & Co. liable for the churning of Mrs. Hecht's account on the grounds that it did not maintain an adequate system of internal control and that in failing to be diligent, even with the system then in force, it did not act in good faith. Liability was imposed under Section 20(a) of the Act (15 U.S.C. § 78t (a)).[2]

In Kamen v. Paul H. Aschkar & Company, 382 F.2d 689, 697 (9th Cir. 1967) this Court said the test of liability under Section 20(a) is that the controlling person " * * * must have acted in bad faith and directly or indirectly induced the conduct constituting a violation or cause of action." In that case the manner of supervision of the activities of the employees was held sufficient to establish liability.

There is substantial authority imposing Section 20(a) liability under circumstances similar to those which were before the trial court in this case. Lorenz v. Watson, 258 F.Supp. 724 (E.D.Pa. 1966); Goodman v. H. Hentz & Co., 265 F.Supp. 440 (N.D.Ill.1967); See also, Moscarelli v. Stamm, 288 F.Supp. 453, 460 (E.D.N.Y.1968); Anderson v. Francis I. duPont & Co., 291 F.Supp. 705, 710 (D.Minn.1968); Myzel v. Fields, 386 F.2d 718, 738 (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). We affirm the court's finding of liability for churning under Section 20(a).

## STATUTE OF LIMITATIONS

Both parties agree and the trial court properly held that the California statute of limitations for fraud (3 years as provided in Cal.C.C.P. § 338(4)) applies to plaintiff's cause of action. Fratt v. Robinson, 203 F.2d 627, 634–635 (9th Cir. 1953); Royal Air Properties, Inc. v. Smith, 312 F.2d 210, 214 (9th Cir. 1962).

■ Defendant argues however that there was no withholding of information and that the plaintiff had facts within her knowledge which constituted notice sufficient to bar her suit entirely. The District Court held to the contrary and found that Wilder did not "frankly and fairly" explain "basic considerations" which would have indicated the amount of trading actually going on in the account. 283 F.Supp. at p. 434. It was concluded that:

" * * * the information on hand to plaintiff at any one time, considered in the light of the limitations upon her competence and circumstances already reviewed, was not sufficient to put her on notice that the trading of her account was excessive—until she was so advised by her income tax accountants in March, 1964—the date we find to be the date of discovery so far as 'excessive' trading is concerned." *supra* at p. 441.

The finding of the court is amply supported by the record and not clearly erroneous. We conclude that suit was timely commenced against Wilder and Harris, Upham & Co., on September 20, 1965.

## COLONIAL AND ITEK

During the course of the trial evidence was presented showing that Wilder had

2. § 78t.
"(a) Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

converted his customers' securities to his own use through fraud and deceit. The facts surrounding these dealings (designated Colonial and Itek transactions) are described in the lower court opinion commencing at page 442. Damages for this loss were awarded in the sum of $64,520.

■ Appellants first argue that no recovery should have been granted since the transactions were first set out in pleadings submitted more than three months after the Statute of Limitations had expired. Conceding that this might be true, at the close of the trial motions were made by both parties under Rule 15(c) of the Fed.R.Civ.P. to conform the pleadings to the proof at trial. The motions were granted. The effect of this order was to relate the Itek and Colonial transactions back to the time of filing the complaint for the purposes of tolling the statute. There was sufficient identity between these transactions and the conduct alleged in the complaint to satisfy the rule. We do not find appellants were thereby prejudiced within the meaning of Rural Fire Protection Co. v. Hepp, 366 F.2d 355, 362 (9th Cir. 1966). Accordingly the Statute of Limitations did not bar Mrs. Hecht's recovery.

It is next asserted appellants were denied the opportunity to cross-examine the plaintiff concerning these transactions and otherwise tender evidence on the issue.

■ The trial judge did not prevent appellants from exercising their right to cross-examine witnesses on this issue. The court ruled that the evidence introduced would not be binding on appellants unless the court thereafter ruled that it was applicable. If appellants were in doubt as to their right of cross-examination they should have sought a definite ruling from the court. In addition, they were granted the right to reopen the case for presentation of further evidence on the Itek and Colonial transactions. We do not find that appellants were placed in an unfavorable

position by having to reopen at a later time. Further, we cannot agree that it was too late to offer additional evidence. Appellants' arguments of disadvantage are not persuasive.

■ Lastly, appellants take issue with the ruling of the District Court that they were liable for these transactions under Section 20(a) of the Act. The findings of the court on this issue are supported by the record. As in the case of churning, adequate internal supervision would have prevented this loss.

MERRILL, Circuit Judge:

DAMAGES

The District Court, 283 F.Supp. at 444, by schedule specified damages awarded in the sum of $439,520. This included the sum of $64,250 covering the Itek and Colonial transactions. The balance was broken down as follows:

*Actual damages due to churning:*
Commissions and interest
    paid by plaintiff    $232,000
Other damages due to
    churning    <u>143,000</u>
        <u>$375,000</u>

We have trouble with the $143,000 item of "other damages due to churning".

This sum includes $78,000 net loss suffered by the commodities account and $65,000 for dividend income loss attributable to the fact that money was diverted from the securities account to the commodities account.

Allowance of these items of damage seems to us to be inconsistent with the court's findings of waiver and estoppel (as quoted earlier in Judge Powell's opinion), and its denial on that ground of damages for loss of value in the *securities* account.

The court's reasoning in allowing these items of damage, notwithstanding its ruling on waiver and estoppel, was that Wilder's purpose in guiding Mrs. Hecht into the commodities market was solely to provide an additional opportunity to generate commissions and that "the com-

modity account may be regarded as a mere device for churning the securities account * * *." 283 F.Supp. at 437. Therefore, "Since the commodity account was 'a mere device for churning the securities account', the commodity losses of plaintiff, although not recoverable by plaintiff *as such,* are nevertheless, recoverable insofar as they proximately resulted from this means of churning the securities account." 283 F.Supp. at 440.

■ We find no error in the District Court's holding that the relationship between the securities account and the commodities account was such as to make commodities churning a fraud on the securities account and damages for that churning recoverable in this case. We do, however, have difficulty with the conclusion that loss of value in the commodities account and loss of dividend income were proximately caused by churning. The fact that the commodities account was initiated for the purpose of diversifying opportunities for churning does not to us support that conclusion if we accept the court's determination that Mrs. Hecht cannot otherwise be heard to say that commodity futures were an unsuitable subject for trading. If loss of value in the account occurred (beyond the cost of commissions), it would seem to be due not to the number of transactions engaged in but to the unfortunate choice of risk those transactions entailed. If loss in dividend income was suffered it was due not to the fact of overtrading, but to the fact that Mrs. Hecht was in commodities. These, however, are complaints Mrs. Hecht has been held estopped to assert. This would not, of course, preclude recovery were the loss attributable to Wilder's disregard of Mrs. Hecht's interests in profits or limitation of losses. However, a preoccupation with commissions to the point of churning does not compel an inference

that such was the case and the court has not found to that effect.

We conclude that judgment in these respects is not supported by the findings of the District Court. Consequently the total award of damages, $439,520, must be reduced by the amount of $143,000.

Judgment, as modified, is for plaintiff-appellee in the sum of $296,520 plus interest at the rate of 7 per cent per annum on the sum of $232,000 (the portion of judgment specified by the District Court as subject to interest). In all other respects the judgment of the District Court, including its judgment against Wilder, is affirmed. No costs are allowed to either party.

POWELL, District Judge (dissenting in part).

I dissent from the separate opinion on damages.

By taking $143,000 of the judgment away from the plaintiff the Court is adopting the formula for measure of recovery set forth in Newkirk v. Hayden, Stone & Co. CCH Fed.Sec.L.Rep. para. 91,621 (S.D.Calif.1965). There are court said: "Damages should be limited to the amount of the commissions because this is the only element of damage which was proximately caused by defendants." In narrowing recovery for churning solely to commissions earned (plus interest on the margin account) the Majority overlooks the fact that the dealer in his zeal to earn commissions may have caused damage unrelated in amount to what he earned in commissions.[1]

The trial court concluded from the facts of this case that " * * * the excessive trading of plaintiff's account by Wilder in both securities *and* commodities did constitute a single scheme. Although only $7,500 was originally deposited in plaintiff's commodity account,

[1]. Churning by Securities Dealers, 80 Harv. L.Rev. 869, 883 (1967). See e. g. Stevens v. Abbott, Proctor & Paine, 288 F. Supp. 836, 851 (E.D.Va.1968) where the court in addition to awarding commissions charged in the amount of $59,-689.99, also awarded $35,831.78 for capital gains taxes incurred.

*Wilder was able to effect an enormous amount of commodity trading by transferring a total of $245,360 from her security account to the commodities account.* Thus, the security and commodity transactions were inextricably co-mingled." (Emphasis added). 283 F.Supp. at 437.

Although Mrs. Hecht was held to be estopped to deny knowledge that securities were being sold to enable Wilder to purchase commodities, the trial court also found " * * * she just did not have the sufficient competence to understand whether the frequency and volume of the transactions might be 'excessive'." 283 F.Supp. at 434.

This *excessive transferring of money* from the securities account into the commodities account naturally resulted in a loss of dividend income from security investments. The district court awarded Mrs. Hecht $65,000 for this loss. Recognizing that she had knowledge that a portion of her securities had been sold to purchase commodities, the court did not award her the entire loss of dividend income as if no authorized transfers had occurred. The record indicates that figure could have amounted to $108,000.

To the degree that she was in commodities beyond her knowledge and as a result of Wilder's scheme to generate commissions by the *excessive transfer* of money from the securities account to the commodities account she was entitled to recover damages. The award of $65,000 was not clearly erroneous and in my opinion should be affirmed.

The Majority would further disallow damages of $78,000 awarded for net commodity losses. The Majority has concluded that "[i]f loss of value in the account occurred (beyond the cost of commissions), it would seem to be due not to the number of transactions engaged in but to the unfortunate choice of risk those transactions entailed." Maj. Damage Opin. at p. 1212.

I assume from this statement the Majority has decided that Mrs. Hecht's commodity account was in fact churned but that any loss beyond that of cost of commissions was due to the risks of commodity trading of which she had knowledge.

The record in this case might support that conclusion had the trial judge made it. The fact is he did not. He found that there was an excessive transferring of money from the securities account into the commodities account, and that the action was pursuant to Wilder's fraudulent scheme to generate commissions. Mrs. Hecht was therefore more deeply involved in commodity trading than she knew. As a consequence her losses were just that much greater. For that she was entitled to redress. The trial court awarded her $78,000—the net commodity losses.

The loss of $78,000 could very well have been a substantial profit considering the size of the account and assuming it was properly traded. The evidence in this case discloses churning of a grand magnitude. In the eight years the commodity account was with Harris, Upham & Co., total sales and purchases exceeded $89,000,000; commissions charged to Mrs. Hecht were $98,338; and the account profited in only two of the eight years. The years of most significant transferring from the securities account to the commodities account were also the years in which the commodities account sustained its greatest losses, e. g., in 1963 there were eleven transfers from the securities account to the commodities account in the amount of $104,000. In that year the commodity account sustained losses in excess of $116,000.

In my judgment the award of $78,000 for commodity account losses is sustained by the evidence. While the damages may have been difficult to compute "* * * the risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party." Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931).

The record and opinion of the district court clearly demonstrate the care and attention the court gave in reaching a just conclusion from a very complicated set of facts operating in a fairly new area of the law.

This Court should not reduce damages by $143,000. Such action is unwarranted on the facts as found. The findings are not clearly erroneous. I respectfully dissent.