John B. HORNE, Jr., Plaintiff,

v.

FRANCIS I. duPONT & CO. et al., Defendants.

Civ. A. No. 615–73.

United States District Court,
District of Columbia.

March 18, 1977.

Melville W. Feldman and Allen W. Cohen, Feldman & Sheehan, Washington, D. C., for plaintiff.

Robert M. Dougherty, Washington, D. C., Mark P. Friedlander, Friedlander, Friedlander & Brooks, Arlington, Va., for defendants.

## MEMORANDUM OPINION

SIRICA, District Judge.

This is an action in which plaintiff, John B. Horne, Jr., brought suit against his former brokerage firm, Francis I. duPont & Co. (duPont), and his former account representative at duPont, William D. Bergquist, alleging fraud and conversion by defendants in connection with their handling of his securities investment account at duPont during the period April through November 1970. The gist of the action is that Bergquist individually and duPont, through its agents and employees, committed fraud on Horne by overtrading in his account without regard for his interests as an investor and for the purpose of generating commissions. Horne also claims that duPont converted $20,000 worth of A.T.&T. 8¾ percent bonds rightly belonging to him by retaining them over his objections, then selling them and keeping the proceeds along with all earned interest.

Bergquist answered the complaint with a general denial of the allegations of wrongdoing. DuPont likewise answered with a general denial, but additionally filed a counterclaim for approximately $25,000,

representing the amount of a debt allegedly incurred by Horne as a result of his borrowing funds from duPont to support margin trading in his account. The case came on for trial by the Court on October 26, 1976. All issues of fact were tried at that time except those relating exclusively to the counterclaim. Trial of the counterclaim was postponed pending resolution of the principal claims advanced by Horne. Thus limited, the matter is ripe for decision.

## I. BACKGROUND FACTS

On October 1, 1969, Horne opened an investment account with duPont. At the time, Horne already had an account with E. F. Hutton & Co., a competing brokerage firm, where he conducted the bulk of his trading activity, using Bergquist, then an account representative at Hutton, as his personal broker. In 1970, Bergquist left Hutton to join duPont as an account representative and, no doubt because he and Horne had a social as well as business relationship, Horne asked that his duPont account be placed in Bergquist's care.

Throughout this period, Horne was employed by the Pepsi-Cola Bottling Company of Washington, D. C. as an executive in charge of the company's health and pension plans. Horne was also a substantial shareholder of Pepsi-Cola. Before joining this company in 1962, Horne had worked from 1945 to 1961 as chief operating officer of his family's 5000-acre farm in Georgia. Before that, he had worked as a salesman, served in the armed services and was employed on the family's farm in an unspecified position. Horne held these positions after graduating from college with a degree in Economics.

In opening his account at duPont, Horne stated that his investment objective was "capital appreciation," meaning that he intended to acquire securities in companies having a favorable financial position and growth potential over the long term. Despite his stated objective, however, Horne traded on numerous occasions in highly speculative securities. Further, when Horne opened his account at duPont, he elected to trade on a "cash" rather than a "margin" basis. Yet substantial trading took place "on margin" if not with Horne's written consent then with his knowledge and acquiescence.

Between April 21, 1970, when Bergquist began handling Horne's duPont account, and November 24, 1970, the end of the period at issue, the average equity in the account was approximately $54,000. During this period, over 120 transactions were recorded in the account. Within a few days of each transaction, Horne received a confirmation slip, reflecting the change that had taken place in the account. Of the approximately 120 trades, a scant few are claimed to have been made without authorization, yet the great majority were either initiated by Horne or approved by him after Bergquist made a suggestion. These transactions amounted to about $2,900,000 in trading volume and accounted for nearly $21,000 in commissions earned by Bergquist. This sum represented 39.5 percent of Bergquist's earnings during the subject period.

Much of the trading in Horne's account was on the "chart and point" basis. This is a mathematical system for projecting what stocks are likely to do and for determining, based on what actually occurs, when and in what quantity to trade in the stocks. Although no written agreement was entered into by Horne and duPont for using the "chart and point" system, Horne orally approved of it and acquiesced in its being used. Furthermore, as an experienced investor, Horne was intimately familiar with the operation of "chart and point" trading in his account.

In April 1970, Horne delivered A.T.&T. stock to duPont, directing that the shares be sold and the proceeds used to purchase $20,000 worth of A.T.&T. 8¾ percent bonds. Horne also directed that once the bonds were purchased, they should be delivered to him personally. On June 8, 1970, duPont purchased the bonds and placed them in Horne's cash account but, despite repeated requests by Horne that the bonds be turned over to him, duPont retained possession of them. On September 18, 1970, duPont

transferred the bonds from Horne's cash account into a newly-created bond margin account. There, the bonds were commingled with other securities held by duPont and later they were sold, with duPont retaining the proceeds. To date, Horne has never received any of the interest paid on the bonds from the time they were purchased until the time duPont sold them. This occurred at an unspecified date in 1973.

## II. DISCUSSION

Horne claims (A) that Bergquist and duPont committed fraud by overtrading or "churning" his account in violation of S.E.C. rule 10(b)5 and (B) that duPont converted his A.T.&T. bonds by retaining them over his repeated objections and by later selling them and retaining the proceeds and paid interest. Based on a studied review of the evidence brought out at trial, the Court concludes that Horne has failed to prove fraud but succeeded in proving conversion. This success, however, is at best only tentative since all or part of the recovery for conversion is subject to duPont's counterclaim. And because trial on the counterclaim has yet to take place, entry of judgment in favor of Horne must be deferred. Fed.R.Civ.P. 54(b).

A. *The extensive trading that took place in Horne's account does not amount to churning in violation of S.E.C. rule 10(b)5.*

■ The offense of churning involves excessive trading in an investment account against the interests of the investor and for the purpose of generating commissions for the broker and the brokerage firm. *Hecht v. Harris, Upham & Co.*, 430 F.2d 1202 (9th Cir. 1970); *Stevens v. Abbott, Proctor & Paine*, 288 F.Supp. 836 (E.D.Va.1968). In determining whether churning has taken place, the courts have looked to (1) the number and frequency of the trades, (2) the amount of "in" and "out" trading, (3) the amount of commissions generated by the trading both in dollar terms and as a percentage of the broker's salary (4) the investor's objectives in the market and his level

of business sophistication and (5) the degree of control exercised by the securities dealer over the investment account. *Hecht, supra; Stevens, supra.* See also 17 C.F.R. § 240.-15c 1–7(a) (the S.E.C. regulation defining churning).

In this case, it does appear that the number and frequency of the trades in Horne's account were, to say the least, considerable. It also appears that a significant number of the trades were "in" and "out" of the same security. The evidence further shows that defendant Bergquist earned over $20,000 in commissions from Horne's account, representing 39.5 percent of his total salary during the 8-month period at issue. Still it does not appear that churning occurred. The principal reason for this is that Horne was an experienced investor and, by his own admission, knowledgeable in "margin," "in and out," "long and short" and "point and chart" basis trading. What's more, he knew precisely how these trading methods were operating in his account.

■ Of the cases where churning was found to exist, almost all involved brokerage customers who, unlike the plaintiff here, were lacking in the rudiments of security trading. See, e. g., *Stevens, supra.* The relevance of market acumen and experience in this context is obvious. Section 10(b) of the Securities Exchange Act of 1934 and S.E.C. rule 10(b)5 protect investors against the use of manipulative and deceptive practices in connection with the purchase and sale of securities. What makes a practice manipulative or deceptive depends, and frequently in large part, on the ability of the investor to understand the economic consequences of what has taken place in his account. For all that was shown at trial here, Horne both was able and had ample opportunity to understand precisely what was occurring in his account with full knowledge of the economic consequences. It would simply be at odds with the evidence to find otherwise.

■ Further, the evidence fails to show that Bergquist exercised his own discretionary control over Horne's account, as is necessary to prove churning. While a few of

the trades were claimed to have taken place without authorization by Horne, the vast majority were admittedly either initiated by Horne or approved by him after Bergquist offered a suggestion. Still further, the facts fail to disclose that the pattern of trading that took place in Horne's account was inconsistent with his investment objective. Although that objective was stated to be "capital appreciation," the fact emerges clearly from the evidence that Horne was willing, if not eager, to trade in highly speculative securities. This willingness to speculate, particularly in view of the fact that Horne was a man of substance able to commit capital to speculative uses, indicates that his actual objective was not long term appreciation but rather short term profits. The absence of a written statement to this effect does not detract from this finding.

Against this background, it is impossible to conclude that defendants committed fraud on plaintiff in connection with the admittedly extensive trading that took place in his account.

B. *DuPont committed conversion by wrongfully retaining Horne's bonds and later disposing of them.*

The essence of conversion is an interference with another's property that is so substantial as to justify treatment as a forced sale of the property. W. Prosser, Law of Torts 80–81 (4th ed. 1971). Conversion takes place where defendant has "come rightly into possession" of plaintiff's property and "then refuses to surrender" it. *Id.* at 89. See also *Boiseau v. Morrissette,* 78 A.2d 777 (D.C.Mun.App.1951). Here the evidence shows that in April 1970, before Horne began dealing with Bergquist at duPont, Horne deposited approximately $20,000 worth of A.T.&T. stock to be sold and used to purchase an equal amount of A.T.&T. bonds. On June 8, 1970, the order was executed and duPont placed the bonds in Horne's cash account. At this point, Horne was the rightful owner of the bonds and had a right to possess them. But duPont thereafter transferred the bonds into a bond margin account, where they were commingled with other securities held by the brokerage firm. Despite repeated demands by Horne that the bonds be delivered to him, duPont retained possession, eventually selling them sometime in 1973. At no time after the bonds were purchased in 1970 did Horne receive any of the interest paid on them. Nor has Horne ever received the proceeds from the sale of the bonds although, it should be noted, Horne may have received the benefit of the proceeds and paid interest insofar as duPont applied these sums against the debt which Horne allegedly incurred as a result of his margin trading. This debt has yet to be proved.

These events reveal that Horne was the rightful owner of the A.T.&T. bonds and that duPont converted them. The measure of damages for conversion is generally determined by treating the wrongful act as a sale of the converted property, entitling the rightful owner to the market value of the converted property as of the date of conversion. This rule is designed to compensate the owner for the "natural consequence and proximate result" of the tort. *Boiseau, supra,* 77 A.2d at 780. In this case, an accurate measure of compensatory damages is the face value of the bonds plus the accumulations of unpaid interest as of the date in 1973 when duPont sold the bonds. This measure of damages readily lends itself to making the wronged party whole. Punitive damages, on the other hand, are not appropriate under the circumstances in that no bad faith on the part of duPont is evident from the record.

## III. CONCLUSION

As stated, duPont has filed a counterclaim against Horne to recover approximately $25,000 as a debt allegedly incurred by Horne in connection with his margin trading. This counterclaim is essentially the mirror image of Horne's claim for conversion. Trial on the counterclaim was postponed pending resolution of the principal claims. Given that fact, judgment on the conversion claim must be put off until

evidence is taken on duPont's counterclaim, or until the case is otherwise disposed of.

The foregoing opinion shall constitute the findings of fact and conclusions of law in this matter.