28 F.3d 107
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Keith MEYERS and Meyers Livestock, Petitioners,
v.
COMMODITY FUTURES TRADING COMMISSION, Respondent.
 No. 92-70594.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 7, 1994.
Decided July 13, 1994.
 
 1
 Before: ALARCON and FERNANDEZ, Circuit Judges, and WILSON, District Judge[1].
 
 MEMORANDUM[2]
 
 2
 On April 28, 1988, Petitioners Keith Meyers and Meyers' Livestock filed a reparations complaint with the Commodity Futures Trading Commission. Respondents in the action were Saul Stone and Company, Cole Commodities, George White Commodities, George White and Mary White. The complaint alleged three violations of the Commodity Exchange Act: unauthorized trading, churning and failure to supervise.
 
 
 3
 A hearing was held before an administrative law judge from August 21 through August 24, 1989. On March 9, 1990, the ALJ issued a decision dismissing all of Petitioners' claims.
 
 
 4
 On March 28, 1990, Petitioners filed a notice of appeal with the CFTC. On August 11, 1992, the CFTC issued an Order of Summary Affirmance.
 
 
 5
 Petitioners presently petition for review of the order of the CFTC.
 
 I.
 
 6
 The present action concerns losses incurred in Petitioners' commodity account during the summer of 1986. The account was carried by Saul Stone and Company and traded by George White, Patricia White and Henry Kornegay through George White Commodities. The ALJ found the following facts to be true.
 
 
 7
 Keith Meyers owns and operates Meyers' Livestock and lives in Circle, Montana. Steven Meyers is Keith Meyers' son. During the summer of 1986 he was 23 years old and a college student in Billings, Montana. At that time he was an officer of Meyers' Livestock, and had worked there for nine years. He was authorized to write checks on the Meyers' Livestock checking account.
 
 
 8
 Keith Meyers met George White in 1985 when George White was associated with Heinhold Securities. In January 1986, at George White's suggestion, Keith Meyers opened a trading account with Heinhold. In executing the requisite documents, Keith Meyers listed as owners of the account "Keith Meyers" and "Meyers Livestock."
 
 
 9
 Later in 1986, George White became associated with Saul Stone Commodities. Keith Meyers transferred his account to Saul Stone Commodities, as did virtually all of George White's customers. In making the transfer, Keith Meyers filled out a "Customer Fact Sheet. In response to the question "Risk Capital Available for Commodity Trading: __$", Keith Meyers wrote "hedger." Furthermore, he checked "no" in response to the question: "Will this account be traded on your behalf by someone else?" Keith Meyers also signed a "bona fide hedge" letter, which stated that all of the orders in the account would "represent bona fide hedges, as defined by the Commodity Futures Trading Commission."
 
 
 10
 At the end of March, 1986, the trading account held the following open positions: 12 June, 1986 Cattle; 8 August, 1986 Cattle; and 6 October, 1986 Cattle. The open trade loss amounted to $18,140. The realized loss amounted to $6,644.64.
 
 
 11
 At the end of April, 1986, the account held the following open positions: 23 June 1986 Cattle, 8 August 1986 Cattle, and 6 October 1986 Cattle. The open trade loss amounted to $28,390; there was no realized loss. Four deposits were made into the account totalling $81,550. These payments were made in the form of checks written by Keith Meyers' wife, Helen Meyers.
 
 
 12
 The account was heavily traded in June. By the end of this month, 370 contracts had closed and none remained open. There was a realized loss of $159,651. Three payments were made into the account, two for $4,000 and one for $20,000. The payments were in the form of checks written by Steven Meyers.
 
 
 13
 The heavy trading continued in July. By the end of that month, 272 additional contracts had been closed, and 80 new contracts remained open. Among the contracts were 112 hog contracts. There was a realized loss of $37,000. Four payments were made into the account totalling $28,000. It is not known who wrote the checks.
 
 
 14
 On July 31, 1986, Keith Meyers authorized a wire transfer from his bank for $220,000 payable to Saul Stone in Chicago. The payment was necessary because the account had been on margin call for five days.
 
 
 15
 At the end of August, 272 contracts had closed and 220 were open. Among the contracts were 114 hog contracts and 50 cattle options. There was a realized loss of $6,845.
 
 
 16
 At the end of September 593 contracts had closed. Among the contracts were 100 hog contracts. There was a realized loss of $203,315. One check, for the amount of $100,000, was paid into the account. It was written by Steven Meyers. On September 30, Keith Meyers took out a promissory note from his bank for $100,000.
 
 
 17
 On September 4, the open account value of Meyers' account exceeded total deposits by several thousand dollars. However, the market quickly deteriorated, resulting in a margin call of about $150,000. Open positions were liquidated to meet this call, resulting in aggregate losses of about $400,000.
 
 
 18
 During the first week of August 1986, Keith Meyers met Patricia White at the state fair. Later that week, the Meyers and the Whites had dinner together at a hotel. Keith Meyers met the Whites in November, 1986, in a hotel. They met and sat together socially. The Whites and the Meyers met again on New Years Eve.
 
 
 19
 Most of the trades made during the summer of 1986 were entered by George White. Some were entered by Patricia White; some were entered by Henry Kornegay. Confirmations for each trade were sent to Keith Meyers.
 
 
 20
 Keith Meyers authorized all trades prior to May, 1986.
 
 
 21
 Steven Meyers authorized all of the trades entered into after May, 1986. He began coming into the Whites office in April; and he started to place orders on the account in May. He continued to come into the office on a steady basis, almost daily, from June through September. He often spent the entire day at the office, and often called his father from the office telephones in order to discuss trading. Furthermore, Steven Meyers was drinking heavily during this period. Sometimes he and George White would drink together in the afternoon.
 
 
 22
 Keith Meyers orally authorized Steven Meyers to trade his account in March, when told George White that Steven Meyers had been studying commodity trading and would be coming into the office to trade the account. Keith Meyers confirmed this authority on several occasions. On one occasion when Steven Meyers sought to close a position that Keith Meyers had entered earlier, George White called Keith Meyers to ascertain whether Steven Meyers had the authority. Keith Meyers emphatically stated that Steven Meyers did. Similarly, in July, George White again called Keith Meyers out of concern over the large number of trades. George White informed Keith Meyers that the trades were being entered into against his recommendation, and that the Whites were not running a "churn shop." Keith Meyers told George White to mind his own business and let Steven Meyers do what he wanted. Finally, in early September, George White made a third call to Keith Meyers. At this point, the accounts had turned profitable after showing earlier large losses. George White strongly recommended that the accounts be closed. Keith Meyers suggested that George White tell Henry Kornegay to speak with Steven Meyers and recommend that Steven Meyers get out of the positions. Kornegay had this conversation with Steven Meyers, but Steven spurned the advice on the belief that cattle prices would rise yet higher.
 
 
 23
 Keith Meyers never authorized Steven Meyers in writing to trade his account. The Whites never sent Keith Meyers a written confirmation of Steven Meyers' authority.
 
 II.
 
 24
 The CFTC board must review the decision of the ALJ in order to determine whether substantial evidence, looking at the record as a whole, supports the ALJ's conclusions. See Dohmen-Ramirez v. Commodity Futures Trading Com., 837 F.2d 847, 856 (9th Cir.1988).
 
 
 25
 In turn, we review the factual findings of the CFTC to determine if they are "supported by the weight of the evidence." 7 U.S.C. Sec. 9; See Premex, Inc. v. Commodity Futures Trading Com., 785 F.2d 1403 (9th Cir.1986); Dohmen-Ramirez, 837 F.2d at 856.
 
 
 26
 In the Ninth Circuit, "weight of the evidence" has been construed to mean "preponderance of the evidence." Dohmen-Ramirez, 837 F.2d at 856. This standard has been explained as follows:
 
 
 27
 Our role in reviewing CFTC reparation orders is extremely narrow.... The function of this court is something other than that of mechanically reweighing the evidence to ascertain in which direction "preponderates"; it is rather to review the record for the purpose of determining whether the finder of fact--here the ALJ--was justified.
 
 
 28
 Id. at 856, citing Chapman v. Commodity Futures Trading Com., 788 F.2d 408, 410 (7th Cir.1985).
 
 
 29
 Furthermore, particular deference should be granted to the ALJ's determinations as to the credibility of witnesses because the ALJ has the opportunity to observe the witnesses as they testify. Dohmen-Ramirez, 837 F.2d at 856.
 
 III.
 
 30
 Unauthorized trading is generally deemed to be a violation of the anti-fraud provisions of Sec. 4b of the Commodity Exchange Act.[3] To prevail on such a claim, the aggrieved party must show that the responding party engaged in unauthorized trades and possessed the requisite scienter. See Commodity Futures Trading Com. v. Savage, 611 F.2d 270, 283 (9th Cir.1979).
 
 
 31
 Unauthorized trading claims often arise in situations such as the present, where a broker takes orders from a third party who professes to be an agent of a customer. See Drexel Burnham Lambert, 850 F.2d 742 (upholding CFTC finding of liability under Section 4b(A) where broker traded account of client at the behest of employee who had no authority to trade account); In re Interstate Securities Corporation, Comm.Fut.L.Rep. (CCH) Par. 25,295 at 38951 [90-92 Transfer Binder] (finding liability where broker made trades pursuant to the request of officer of corporation who was not authorized to make the trades).
 
 
 32
 The ALJ rejected the claim of unauthorized trading because he found that Keith Meyers had authorized Steven Meyers to trade the account, and that Steven Meyers had authorized the individual trades. Petitioners argue that the ALJ erred in making these findings. Two issues are posed on appeal: (1) whether the court may presently overrule the ALJ's factual findings of oral authorization; (2) whether authority to trade an account may be granted orally.
 
 
 33
 The ALJ's findings of oral authorization rested in his determination that the Whites' testimony was more credible than the Meyers'. We must presently defer to this finding.
 
 
 34
 George White testified that Steven Meyers authorized all of the trades, and that Keith Meyers had orally communicated to George White on at least three occasions that Steven Meyers had authority to trade the account.
 
 
 35
 Keith Meyers, on the other hand, testified that he never communicated Steven Meyers' authority to trade, that he had no knowledge that his account was being traded during the summer of 1986, and that he never read the trade confirmations or monthly statements that were sent to his house. Steven Meyers' testified that George White first suggested that Steven Meyers trade the account in order to surprise his father with profits. He also testified that George White suggested all of the trades which he entered into, and that George White entered into a number of trades without his approval.
 
 
 36
 Petitioners argue that the court should not defer to the ALJ's determinations of credibility, because the ALJ was absurdly naive in believing White. See Domenico v. Rufenacht, Bromagen & Hertz, Inc. Comm.Fut.L.Rep. (CCH) Par. 23,934 at 34,270 [1987-1990 Transfer Binder] (refusing to adopt credibility findings of ALJ where ALJ professed to credit testimony which did not exist). Furthermore, Petitioners argue that courts should grant close scrutiny of factual matters when the record demonstrates that there are significant questions about the quality or thoroughness of the ALJ's analysis. Lyles v. United States, 759 F.2d 941, 944 (D.C.Cir.1985) (remanding case to District Court for purposes of further findings where present findings lacked coherence and were too conclusory for appellate review).
 
 
 37
 Contrary to Petitioners' argument, the AL's credibility findings were neither naive nor conclusory. They were rooted both in the ALJ's "observation of the demeanor of the parties," and the "factual matters that are beyond dispute."
 
 
 38
 The ALJ explicitly stated his reasons for disbelieving the Meyers' testimony. For example, the ALJ disbelieved Keith Meyers assertion that he did not read the monthly statements and confirmations of all trades which were sent to the Meyers' home. Considering Keith Meyers admitted to reviewing these documents through May, the ALJ found it implausible that he abruptly stopped in June. Among the open positions in the account at the end of May were contracts for June cattle, which meant that, if the position were left open, Keith Meyers would have had to accept delivery of the cattle. Similarly, the ALJ found Keith Meyers' professed ignorance of the trades implausible in light of his authorization of the $220,000 wire transfer of July 31, which was made directly into the trading account. Finally, the ALJ pointed to inconsistencies in Keith Meyers' testimony regarding the trades that he did in fact authorize. At first he testified that he authorized trades in April and May, on cross-examination he recanted and stated that the only authorized trades took place in March.
 
 
 39
 The ALJ disbelieved Steven Meyers' testimony that he never mentioned the trading to his father during their twice daily conversations. Other parties had overheard these conversations and had heard him mention the trading in the account.
 
 
 40
 The ALJ also cited numerous reasons for believing the Whites. They had been in the business for many years and had never been the subject of disciplinary action. All of their customers remained with them when they moved from Heinhold to Stone. Furthermore, the Whites and Meyers had dinner together in August, several weeks after the wire transfer. The Whites claimed that the trading was briefly discussed, but the wire transfer was never mentioned. Similarly, two amicable meetings between the parties occurred after the account was closed in September, during which the Meyers did not raise any grievance with the Whites.
 
 
 41
 Furthermore, the CFTC did not err in upholding the ALJ's finding that trade authorization could be granted orally. Petitioners' forward three arguments for the proposition that trade authorization must be made in writing. First, Petitioners point out that in completing the Customer Service Agreement, Keith Meyers answered "no" in response to a question of whether other parties would trade the account. However, because nothing in the agreement provides that a writing is needed in order to authorize others to trade the account, the Court fails to see how the agreement negates the possibility of oral authorization. Second, petitioners argue that CFTC Rule 166.2 mandates that trading authorization must be made in writing. However, this rule does not apply to the present circumstances; it merely mandates that a writing be executed when the customer grants discretionary authority to the broker. Finally, Petitioners that National Futures Association Compliance Rule 2-8(e), demands that trading authorization be in writing. The problem with this argument, besides from the fact that family members are exempted from the rule,[4] is that reparations actions are means of addressing violations of the Commodity Exchange Act, not industry rules. See Lawrence v. Commodity Futures Trading Com., 759 F.2d 767 (9th Cir.1985). At best, the rule would serve as strong evidence of industry standard. See e.g. Wheeler v. Investment Managers Commodity Corp, Comm.Fut.L.Rep. (CCH) Par. 22,770 at 31,221 [1984-1986 Transfer Binder] (holding that Chicago Boards of Trade prohibiting third party trading may be considered as evidence of industry standard). In the present case, the ALJ took into account the fact that authorization is generally granted in writing, but he found the other evidence to be much more weighty.
 
 
 42
 In short, the weight of the evidence supported the CFTC's decision to affirm the ALJ's credibility findings and the ALJ's determination that trading authority could be delegated orally.
 
 IV.
 
 43
 Churning of accounts is also recognized as a form of fraud actionable under the Commodity Exchange Act Sec. 4b. Morris v. Commodity Futures Trading Com., 980 F.2d 1289 (9th Cir.1993); see also Bowley v. Stotler & Co., 751 F.2d 641 (3rd Cir.1985). Churning occurs when a broker, in bad faith, disregards the interests of the customer and engages in excessive trading for the purposes of generating commissions. Hecht v. Harris, Upham & Co., 283 F.Supp. 417 (N.D.Cal.1968) modified 430 F.2d 1202 (N.D.Cal.1970).
 
 
 44
 To prevail on a claim for churning, complainant must establish two elements: (1) that the broker engaged in excessive trading and (2) that the broker exercised control over the complainant's account. Morris, 980 F.2d at 1295. The broker's control over the account may be actual (i.e. a discretionary account) or de facto. Id. at 1205. Six factors are relevant in determining whether the broker exercised de facto control over an account:
 
 
 45
 (1) the lack of customer sophistication; (2) lack of prior commodity trading experience on the part of the customer; (3) minimum amount of time devoted by the customer to the account; (4) high degree of trust and confidence reposed in the broker by the customer; (5) large percentage of transactions entered into by the customer based upon the broker's recommendation; (6) absence of prior customer approval for transactions entered into on his behalf; and (7) customer's approval of recommended transactions where approval is not based upon full, truthful and accurate information.
 
 
 46
 Id. at 1295 (citation omitted) (overruling ALJ's finding that broker had de facto control over account of doctor who had past investment experience); see also Bowley, 751 F.2d at 641.
 
 
 47
 In the present case, the ALJ ruled on the churning claim by stating: "In view of the finding that the accounts, [sic] were traded by Steven with the Meyers' permission [the churning] claim also fails."
 
 
 48
 Although the ALJ's opinion professed to rest on the fact that Steven Meyers was the properly authorized agent of Keith Meyers, the ALJ's findings support the conclusion that George White could not have churned the account because he had neither actual or de facto control of the case. In 1986, Steven Meyers was a university student. Although he had no prior experience trading, he had been in the cattle business for many years. He was not an uneducated or unsophisticated individual. Furthermore, the ALJ's found that Steven Meyers, and not George White, initiated all of the trades; in fact, the ALJ found that George White often recommended against trading. Finally, Steven Meyers dedicated a great deal of time to management of the account and there is no credible evidence that George White in any way misled him or coerced him into trading without providing accurate information.
 
 
 49
 In conclusion, weight of the evidence supports the CFTC's decision to affirm the ALJ's finding that there was no churning.
 
 V.
 
 50
 Petitioners' final claim is Failure-to-Supervise. Petitioners claim both that Saul Stone Commodities failed to supervise George White and that George White failed to supervise Steven Meyers.
 
 
 51
 Commission Rule 166.3 places a duty on Commission registrants to "diligently supervise the handling by its partners, officers, employees and agents ... of all commodity interest accounts...."
 
 
 52
 George White had no duty to stop Steven Meyers from trading. Steven Meyers was not a partner, officer, agent or employee, and a broker has no duty to stop parties from trading their own accounts. Phacelli v. ContiCommodity Services, Inc., Comm.Fut.L.Rep. (CCH) Par. 23,250 [1986-1987 Transfer Binder].
 
 
 53
 Similarly, the Court must reject the argument that Saul Stone Commodities is liable for failing to supervise George White. This argument rests upon the faulty premise that the Whites acted improperly in permitting Steven Meyers to trade.
 
 
 54
 In brief, the weight of the evidence supports the CFTC's decision to affirm the ALJ's finding that there was no failure to supervise.
 
 VI.
 
 55
 Because we find that the CFTC's Order of Summary Affirmance, issued on August 11, 1989, is supported by the substantial weight of the evidence, that Order is hereby AFFIRMED.
 
 
 
 [1]
 Honorable Stephen V. Wilson, United States District Judge for the Central District of California, sitting by designation
 
 
 [2]
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [3]
 Section 4b provides that it is unlawful for members and agents of member of the contract market engaged in transactions with other parties:
 (i) to cheat or defraud or attempt to cheat or defraud such other person;
 (ii) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;
 (iii) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person; or
 (iv) to bucket such order, or to fill such order by offset against the order or orders of any other person, or willfully and knowingly and without the prior consent of such person to become the buyer in respect to any selling order of such person, or become the seller in respect to any buying order of such person.
 7 U.S.C. Sec. 6b(A).
 
 
 [4]
 Rule 2-8(f) provides that provision (e) does not apply when the individual who owns the account and the individual exercising discretion are members of the same family