Michael K. SMITH and Stephen E. Granville, Appellants,

v.

Noble A. WHITEHEAD and Jo Ann Haltiwanger, Appellees.

No. 79–526.

District of Columbia Court of Appeals.

Argued Feb. 27, 1980.

Decided Sept. 10, 1981.

Rehearing En Banc Granted and Opinion Vacated Jan. 5, 1982.

Edward E. Schwab, Asst. Corp. Counsel, Washington, D. C., with whom Judith W. Rogers, Corp. Counsel, and Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., at the time the briefs were filed, were on the briefs, for appellants.

Chris Marder, Rockville, Md., with whom John G. Gill, Rockville, Md., was on the brief, for appellees.

Before NEWMAN, Chief Judge, and KELLY and HARRIS, Associate Judges.

NEWMAN, Chief Judge:

Appellants are police officers who, while engaged with other officers in a valid search of appellees' apartment for evidence of narcotics possession and dispensation,

also participated in the seizure of several items of consumer goods from the apartment. The property was turned over to the District Property Clerk, who refused to return it to appellees. This action for conversion against the appellant officers followed. A jury found appellants liable to appellees for compensatory and punitive damages of $2,700.

Appellants contend that the seizure of the goods was lawful, and thus that an action for conversion should not have been allowed. Even if the seizure was not lawful, appellants argue that they should not have been held personally liable for the conversion because: (1) they were following the orders of a superior when they participated in the seizures; (2) they had a reasonable good faith belief in the legality of their actions; (3) they did not personally benefit from the seizures; and (4) given the availability of alternative remedies for the return of the property, an action for conversion was inappropriate. Finally, appellants dispute the award of punitive damages.

In Part I we outline the facts of the case. In Part II we find that the seizure was neither within the scope of the warrant nor justified under the plain view exception to the warrant requirement. In Parts III and IV we conclude that there was no legal bar to a finding either that appellants had converted appellees' property or that they were liable for punitive as well as compensatory damages. Appellants' liability depended on questions of fact, which were properly submitted to the jury. The jury's verdict is supported by adequate evidence. We affirm.

## I

During the week of March 18, 1973, appellant Officers Stephen E. Granville and Michael K. Smith of the District of Columbia Metropolitan Police Department received information from a reliable informant that appellee Noble Whitehead was selling narcotics from his residence at 5055A Benning Road, Southeast. To ascertain the validity of this information, appellants, through their informant, made at least two controlled heroin purchases from Whitehead before obtaining a warrant for a search of the entire Benning Road premises. Appellants later asserted that they had also learned from their informant that Whitehead accepted payment for narcotics in movable property as well as money, but that they had refrained from including this information in the affidavit in order to conceal the identity of, and thus protect, their informant. The search warrant and affidavit in support thereof made no mention of such a trade in movables, but stated only that drug-related property was sought including: "heroin, capsules, envelopes, syringes, tourniquets, cookers and paraphernalia used in the preparation of heroin for distribution or use and any other instrumentalities or evidence of illegal possession or dispensation of heroin or of any other narcotic drugs illegally held."

At approximately six o'clock on the morning of March 30, 1973, appellants, under the supervision of Sergeant Clinton Stone and in the company of several other police officers, executed the warrant. They knocked, announced their presence, authority, and purpose, and, receiving no reply, forced open the back door of the apartment with a battering ram. Whitehead was at the time in the bathroom, and appellee Jo Ann Haltiwanger, with whom Whitehead resided, was asleep in the bedroom.

Officer Smith found a packet of heroin on the floor by the toilet, and a loaded revolver, later identified as a stolen firearm, was found in the bathtub. Narcotics and narcotics paraphernalia, as well as cutting materials used to dilute the strength of heroin, were also found scattered in the dining room, the living room, and in the linen closet. Whitehead admitted ownership of the narcotics, and, in response to a question, answered that the police officers had seized all the narcotics in the apartment.

According to appellees' testimony, the officers then proceeded to search the apartment in a reckless and destructive manner. One officer searched each of Whitehead's and Haltiwanger's school books individually, and, as he completed his search, threw

the books on the floor. In the kitchen the officers, as they searched, dumped trash, as well as flour, coffee, cereal, sugar, and other foodstuffs, on the stove and floor. In the bedroom, as the officers inspected clothes in the closet and dressers, they dropped the clothes to the floor and walked on them. They emptied bottles of perfume and, after searching under the rug, left it upside down. In the living room the police, having first probed the couch and having found no evidence of drugs, ripped apart its frame and upholstery. Record jackets were opened; the records were left scattered on the floor, where officers walked on and broke some of them. Haltiwanger testified that when she protested the manner of the search, Officer Smith pushed and struck her.

The officers also found in the apartment items of personal property, which Sergeant Stone testified, he suspected appellees had received in exchange for narcotics. These included two televisions (one color, one black and white), a component stereo set, two cameras, a tripod, a movie camera, two projectors, a cassette tape recorder, a tape deck and a tape case, and a sewing machine. The bases for Sergeant Stone's suspicion, he stated, were first, information he had received from an informant that Whitehead traded narcotics for property, and second, Whitehead's inability to substantiate with sales receipts or cancelled checks his ownership of the property. Appellants also assert as a further basis for their suspicion that "many of the items were not usually found in homes in that area of the city and were duplicative of other property in that apartment...."

Whitehead testified that he explained to the police officers why he and Haltiwanger possessed two television sets and two stereo sets. While Whitehead and Haltiwanger were detained in the Benning Road premis-

es, Sergeant Stone telephoned the Police Department and gave descriptions and serial numbers for each of the items of personal property in question. None of the items was listed on the police "hot sheet" of stolen goods. Sergeant Stone nevertheless ordered that fourteen items be seized. Computer checks done at the station house later the same day showed the same negative result as the "hot sheet." The property was nonetheless turned over to the Police Department Property Clerk, who still holds it.

Whitehead was convicted of possession of narcotics with intent to distribute and of receiving stolen property (the revolver). Following his conviction, the United States Attorney's Office notified the Property Clerk that it would not need the seized items as evidence in future prosecutions. When, however, Whitehead attempted to recover the property upon his release from prison, the Property Clerk declined to return it in the absence of "satisfactory evidence" of legal ownership. *See* D.C. Code 1973, § 4–156(a).[1]

Whitehead and Haltiwanger thereafter brought the instant suit against Officers Smith and Granville for conversion of the items in question. At trial, Whitehead and Haltiwanger testified as to how they had acquired the property, and as to its condition at the time of the seizure. Whitehead presented a receipt for one movie projector. A friend of Whitehead's testified that he had given appellee a camera and a tripod, and Haltiwanger's mother testified that she gave the sewing machine to Haltiwanger. An appraiser assessed the value of the items seized at $600 as of March 30, 1973, the date of the seizure.

The jury returned a verdict holding appellants jointly and severally liable for $500 compensatory damages and $1300 punitive damages for Whitehead, and $100 compensatory damages and $800 punitive damages

1. Property Clerk Douglas Cissel held hearings on October 1, 1976 and October 18, 1976 pursuant to D.C. Code 1973, § 4–156, where Whitehead was given an opportunity to establish ownership of the seized property. (Haltiwanger was incarcerated at the time and requested that Whitehead seek return of her property

also.) At the hearing, a tape of which was played to the jury in the instant case, Whitehead testified that all his purchase records had been misplaced during his incarceration. He stated that he had received other items as gifts, and likewise had no proof of ownership of these goods.

for Haltiwanger. The trial court denied appellants' motion for judgment notwithstanding the verdict or in the alternative for a new trial. This appeal followed.

## II

■ The elements of conversion are: (1) an unlawful exercise, (2) of ownership, dominion, and control, (3) over the personalty of another, (4) in denial or repudiation of his right to such property. *Blanken v. Harris, Upham & Co.*, D.C.App., 359 A.2d 281, 283 (1976). Appellants contend that the seizure of appellees' personal property was lawful, and that, as an essential element of the tort of conversion was lacking, appellees' claim that the items were converted was unfounded. We address first the legality of the seizure.

Appellants made the seizure in the execution of a valid search warrant of the entire premises on Benning Road. They had, however, intentionally omitted mention of transactions in personal property for narcotics and of any items of personalty subject to seizure in the affidavit they submitted in support of the warrant. The purpose of this omission was, according to both Officers Smith and Granville, to conceal the identity of and so protect their informant. Appellants rely on language of the warrant authorizing the seizure of "any other instrumentalities or evidence of illegal possession or dispensation of heroin ..." as encompassing the personal property seized within the scope of the warrant, and argue in the alternative that the seizure was legal under the "plain view" doctrine of *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).[2]

---

**2.** Appellants also cite D.C. Code 1973, § 23–524(e) as authorizing the search. Section 23–524(e) provides in part:

An officer or agent executing a search warrant may seize any property discovered in the course of the lawful execution of such warrant if he has probable cause to believe that such property is subject to seizure under section 23–521(d), even if the property is not enumerated in the warrant or the application therefor, and no additional warrant shall be required to authorize such seizure, if the property is fully set forth in the return.

D.C. Code 1973, § 23–521(d), referred to in § 23–524(e), provides in part:

### A. The Scope of the Warrant

"The Fourth Amendment provides that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched, and the persons or *things to be seized.*'" *Stanford v. Texas*, 379 U.S. 476, 481, 85 S.Ct. 506, 509, 13 L.Ed.2d 431 (1965) (emphasis in original). "[This] requirement ... makes general searches ... impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Id.* at 485, 85 S.Ct. at 512 (quoting *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927)). The historic purpose of this prohibition was to assure "that the people of this new Nation should forever 'be secure in their persons, house, papers, and effects' from intrusion and seizure by officers acting under the unbridled authority of a general warrant." *Id.* 379 U.S. at 481, 85 S.Ct. at 509–10. To achieve this purpose, the authority to issue warrants and determine their scope is strictly confined to judicial officers:

Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers.... When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a

(d) Property is subject to seizure pursuant to a search warrant if there is probable cause to believe that it—

(1) is stolen or embezzled;

\* \* \* \* \* \*

(3) has been used or is possessed for the purpose of being used, or is designed or intended to be used, to commit or conceal the commission of a criminal offense....

Section 23–524(e) merely codifies the plain view doctrine; it manifestly cannot expand upon a Fourth Amendment limitation.

judicial officer, not by a policeman or government enforcement agent. [*Coolidge v. New Hampshire, supra* [403 U.S.] at 449 [91 S.Ct. at 2029] (quoting *Johnson v. United States,* 333 U.S. 10, 14 [68 S.Ct. 367, 369, 92 L.Ed. 436] (1948)).]

In *Andresen v. Maryland,* 427 U.S. 463, 479, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976), the Supreme Court, confronted with the question of the validity of a warrant containing a general phrase, concluded that the challenged phrase—"together with other fruits, instrumentalities and evidence of crime at this [time] unknown" (adaptation in original)—must be read in context. So read, the Court found that the warrant authorized the search and seizure of only a narrow, well-defined category of evidence: that relating to "the crime of false pretenses with respect to Lot 13T"—*i. e.,* the crime *specifically described* in the warrant. *Id.* at 480–81, 96 S.Ct. at 2748–49. More recently, the Court has stated:

> When an official search is properly authorized ... *the scope of the search is limited by the terms of its authorization.* Consent to search a garage would not implicitly authorize a search of an adjoining house; a warrant to search for a stolen refrigerator would not authorize the opening of desk drawers. Because "indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment," *Payton v. New York,* 445 U.S. 573, 583 [100 S.Ct. 1371, 1378, 63 L.Ed.2d 639] (1980), that Amendment requires that the scope of every authorized search be particularly described. [*Walter v. United States,* 447 U.S. 649, 656–57 [100 S.Ct. 2395, 2401–02, 65 L.Ed.2d· 410] (1980) (footnotes omitted) (emphasis added).]

Lower courts, construing the scope of general phrases, have closely confined their reach to evidence of crimes described with particularity in the warrant or its accompanying affidavit; where the warrant and affidavit have not supported such a construction, courts have held that such phras-

es rendered warrants impermissibly general under the Fourth Amendment. Thus in *In re Search Warrant Dated July 4, 1977, For Premises at 2125 S Street, Northwest Washington, D.C.,* 187 U.S.App.D.C. 297, 572 F.2d 321 (1977), *cert. denied,* 435 U.S. 925, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978), the circuit court for the District of Columbia held that a warrant authorizing agents to seize "*any* evidence of conspiracies to steal government property and obstruct justice," *id.* at 300, 572 F.2d at 324 (emphasis in original) authorized only the search for and seizure of evidence of conspiracies that were specifically described in an accompanying thirty-three page affidavit. *Cf. United States v. Roche,* 614 F.2d 6 (1st Cir. 1980) (a warrant authorizing the seizure of a broad category of documents, which were "evidence, fruits and instrumentalities" of the violation of 18 U.S.C. § 1341 (1976), was held invalid because the government's failure to limit the objects of the search and seizure to documents more specifically pertaining to the alleged violation "impermissibly broadened the scope of the search beyond the foundation of probable cause." *Id.* at 7 (footnote omitted).)

The Fourth Amendment thus requires that the general phrase contained in the warrant authorizing a search of appellees' residence be construed narrowly, to authorize seizure only of evidence of the narcotics possession and transactions described in the search warrant and its accompanying affidavit. These documents, though, contained only descriptions of two instances in which the informant had purchased narcotics from appellee Whitehead with Police Department money. They made no reference to the tip Officers Smith and Granville later testified they had received from their informant that Whitehead accepted personal property as well as money in exchange for drugs. The terms of the warrant and affidavit thus limited the scope of the search to evidence of narcotics possession and money sales. Evidence of exchanges of personal property for

narcotics fell outside the scope of the warrant.[3]

## B. Legality of the Seizure under the Plain View Doctrine

■ Appellants contend in the alternative that the seizure of movable personal property was justified under the "plain view" exception to the warrant requirement.

It is a well established principle of criminal procedure that any search or seizure conducted without a warrant [or exceeding the scope of an authorized search] is "*per se* unreasonable under the Fourth Amendment—subject only to a few well-delineated exceptions." One of the judicially recognized exceptions to the warrant requirement is the plain view doctrine. This doctrine, however, will justify a warrantless search only when three requirements are met: the police officer must be lawfully present at the situs of the search and seizure, his discovery of the evidence must be inadvertent, and the items seized must be immediately recognizable as evidence. [*Jackson v. United States*, D.C.App., 404 A.2d 911, 918 (1979) (citations omitted).]

It is undisputed that the officers in this case were lawfully present at the situs of the seizure. Despite the tip they had previously received that items of personal property in the apartment were contraband, appellants argue that the discovery of the items of property they seized was "inadvertent":

> [Sergeant] Stone did not rely exclusively upon information obtained prior to the search in reaching his determination that probable cause existed for the seizures .... [Sergeant] Stone cased his determination upon the following: (1) statements received prior to the search from an informant ... that Whitehead was accepting property, like the seized, in exchange for narcotics, (2) knowledge that prior to the search other police officers had witnessed controlled purchases of narcotics from Whitehead by an informant, (3) discussions with Whitehead about each item seized at the time of seizure, during which Whitehead was unable to give [Sergeant] Stone satisfactory proof of ownership or to otherwise make a satisfactory showing of lawful ownership, and (4) observations by [Sergeant] Stone during the search that the items seized were duplicated by other similar property in the household that are not often found in houses in that neighborhood .... [Reply Brief for Appellants at 3–4.]

---

3. That the personal property might have been evidence of another crime than that for which the search was specifically authorized cannot alone bring its seizure within the scope of the warrant. Such a conclusion would be contrary to the policy of the Fourth Amendment to restrict decisions as to the authorization of warrants to judicial officers.

In *United States v. Rettig*, 589 F.2d 418 (9th Cir. 1978), the Ninth Circuit addressed a situation which has some bearing on the instant case. After having been denied authority by a federal magistrate to search appellant's residence for evidence of cocaine possession and distribution, Drug Enforcement Administration agents the next day applied to a state judge for a warrant to discover and seize evidence of marijuana from appellant's home. The agents entered appellant's house pursuant to the state warrant, and seized extensive evidence of cocaine possession and distribution.

The evidence of cocaine trafficking was suppressed as falling outside the scope of the warrant. The court said:

> By failing to advise the judge of all the material facts, including the purpose of the search and its intended scope, the officers deprived him of the opportunity to exercise meaningful supervision over their conduct and to define the proper limits of the warrant....
>
> ... The question is whether or not the search that was conducted was confined to the authorization given by the magistrate. *In determining whether or not a search is confined to its lawful scope, it is proper to consider both the purpose disclosed in the application for a warrant's issuance and the manner of its execution...., A judicial officer cannot perform the function of issuing a warrant particularly describing the places to be searched and the things to be seized, ... where the police fail to disclose an intent to conduct a search the purposes and dimensions of which are beyond that set forth in the affidavits.* [*Id.* at 422–23 (emphasis added).]

■ The officers' prior expectation, that they would find at the Benning Road address movable property had been received in exchange for drugs, did not alone necessarily preclude seizure of the property under the inadvertence requirement of the plain view exception. This court has applied a "primary purpose" test in interpreting the inadvertence requirement of the plain view doctrine: "[s]atisfaction of the inadvertency criterion would require the discovery of the [challenged evidence] to have been a subordinate aspect of the arrest itself, or the result of some justifying purpose other than merely gathering evidence." *Vance v. United States*, D.C.App., 399 A.2d 52, 59 (1979) (quoting *Brooks v. United States*, D.C.App., 367 A.2d 1297, 1307 (1976)). *See also Brooks v. United States, supra* at 1307 n.15 ("If ... the primary purpose of the initial intrusion, or that of a further intrusion subsequent to the arrest, is the gathering of evidence, the inadvertency requirement cannot be satisfied.")

■ Here, the search warrant and accompanying affidavit reveal that the primary purpose of the police entry into the Benning Road residence was to gather evidence of narcotics possession and dispensation. Also, Officers Smith and Granville, in obtaining the warrant, had intentionally failed to disclose to the issuing judicial officer their belief that there were at appellees' residence consumer goods which were evidence of narcotics dispensation. Furthermore, the officers acquired no additional information during the search, besides that which they possessed when they sought the warrant, which would justify an unauthorized seizure.

If the initial intrusion is bottomed upon a warrant that fails to mention a particular object, though the police know its location and intend to seize it, then there is a violation of the express constitutional requirement of "Warrants ... particularly describing ... [the] things to be seized." ... [T]o extend the scope of such an intrusion to the seizure of objects—not contraband nor stolen nor dangerous in

themselves—which the police know in advance they will find in plain view and intend to seize, would fly in the face of the basic rule that no amount of probable cause can justify a warrantless seizure. [*Coolidge v. New Hampshire, supra* [403 U.S.] at 471 [91 S.Ct. at 2040] (footnote omitted).]

Under these circumstances, where the seizing officers had failed to disclose to the judicial officer issuing the warrant their expectation that they would find a specific variety of incriminating evidence, and where the subsequent search failed to reveal other material information upon which a probable cause determination could be based, the seizure was not justifiable under the "inadvertence" requirement of the plain view doctrine.

■ Under the plain view doctrine, moreover, items not named in the search warrant must also be immediately recognizable as evidence, *id.* at 468, 91 S.Ct. at 2039, under the "totality of circumstances surrounding the seizure" of such items. *United States v. Lee*, 427 F.Supp. 318, 323 (E.D. Ky.1977), *rev'd on other grounds*, 581 F.2d 1173 (6th Cir.), *cert. denied*, 439 U.S. 1048, 99 S.Ct. 725, 58 L.Ed.2d 707 (1978). "The plain view exception is not one which allows the seizure of an item on mere suspicion .... [T]here must at least be probable cause to believe that [an article seized outside the authorization of a warrant] is incriminating evidence." *Bynum v. United States*, D.C.App., 386 A.2d 684, 687–88 (1978). Courts have previously found adequately incriminating to justify seizure under this test, for example, a sawed-off shotgun, shotgun shell, army-green raincoat, and a cloth money bag all of which were partially concealed under a bed, where the seizing officer entered the apartment in hot pursuit of robbery suspects, and one robber had been described as wearing an army-green raincoat and carrying a sawed-off shotgun, *Vance v. United States, supra* at 56, 59; a bent coat hanger, a screw driver, wirecutters, and two citizens' band radios and a tape player seized from an automobile, where cut wires protruded from both

radios and the tape player, *Childress v. United States*, D.C.App., 381 A.2d 614, 616 (1977); a bag holding $14,000 cash found in the works of a toilet into which other inculpatory evidence had just been flushed, *United States v. Diaz*, 577 F.2d 821, 824 (2d Cir. 1978); a large quantity of silverware and other silver items valued at over $39,000 and bearing twenty-six different sets of initials, found in plain view in a laundry room and seized only after police officers ascertained that the apparent owner of some of the silver had lost some silver in a robbery two days earlier, *United States v. Lee, supra* at 321, 323; an attache case containing $9,000 cash still in the wrappers from a St. Louis bank, and a gun found when, pursuant to a valid warrant, officers searched the defendant's room. *United States v. Golay*, 502 F.2d 182, 183 (8th Cir. 1974).

The instant case stands in marked contrast to the above cases. The items seized were common consumer goods situated in ordinary places in appellees' residence, and bore no suspicious markings. A check prior to the seizure showed that they were not listed on the Police Department "hot sheet" of stolen goods. We have previously stated, "[a] television set is far from being obvious contraband . . . ." *United States v. Pannell*, D.C.App., 383 A.2d 1078, 1080 (1978). This applies equally to other ordinary consumer items. Thus there was nothing inherently incriminating about the goods justifying a determination that they were evidence of the dispensation of narcotic drugs.

The government bears the burden of justifying seizures not within the scope of a valid warrant. *United States v. Golay, supra* at 184. In light of the non-incriminating nature of the goods in question, Sergeant Stone's attempt effectively to shift this burden, by demanding that Whitehead demonstrate proof of lawful ownership, was

impermissible. The other factor contributing to Sergeant Stone's "probable cause" determination—the informant's statements—constituted information that the seizing officers had at the time they sought the warrant.

The items seized, we conclude, failed two essential requirements of the plain view exception: discovery of the items was not "inadvertent," and the items were not immediately recognizable as evidence. As the seizure of appellees' personal property was neither authorized by the warrant, nor justified under the plain view exception to the warrant requirement, we find that it was illegal under the Fourth Amendment of the Constitution.[4]

### III

Appellants further argue that, even if the seizure of the goods was wrongful, they should not have been held personally liable for the conversion of appellees' property because: (1) they acted under Sergeant Stone's supervision when they participated in the removal of the property from appellees' residence; (2) they had a good faith belief in the lawfulness of their actions, which, under the qualified immunity due police officers, excused them from liability; (3) the "dominion or control" they exercised over the chattels was very limited in both extent and duration; and (4) due to the availability of alternative remedies, a damages action for conversion was inappropriate. The trial court, they claim, therefore erred in denying their motions for a directed verdict or for judgment notwithstanding the verdict. We disagree.

### A. *Action Pursuant to Orders*

The trial court instructed the jury in part that "a police officer is not relieved of responsibility, merely because he acts at the order of a superior officer. An employee [who,] acting at a command of an

---

4. We agree with appellants that it was improper for the trial court to submit to the jury the issue of the lawfulness of the seizure, where, as here, the evidentiary facts relevant thereto were undisputed. In such a situation, the issue is a question of law to be decided by the court. We need not remand on this point, however, for we owe no deference to the trial court on questions of law. *See* D.C.Code 1973, § 17-305(a).

employer or superior[,] has converted or assisted in converting the property of another[,] is liable to that person." This instruction accurately reflects the common law rule that a legally responsible person is liable for his torts. 86 C.J.S. *Torts* § 32 (1954). The employment relationship may, under the doctrine of respondeat superior, extend liability for torts committed by an employee within the scope of his employment to the employer, but does not relieve the employee of individual responsibility for his acts. *See* W. Prosser, The Law of Torts § 52, at 315 (4th ed. 1971).

■ Nor did appellants' employment as law enforcement officers shield them from liability for their tortious acts. "[A] government officer, like any other person, is liable at common law for his torts, even if they are committed within the scope of his employment." *Carter v. Carlson*, 144 U.S. App.D.C. 388, 391, 447 F.2d 358, 361 (1971), *rev'd in part on other grounds sub nom. District of Columbia v. Carter*, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973). In *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), where federal agents acting under color of their authority had allegedly violated the petitioner's Fourth Amendment rights by entering his apartment, searching, and arresting him without a warrant, the Court held that petitioner had stated a valid claim for money damages.

> That damages may be obtained for injuries consequent upon a violation of the Fourth Amendment by federal officials should hardly seem a surprising proposition. Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty . . . . Having concluded that petitioner's complaint states a cause of action under the Fourth Amendment, . . . we hold that petitioner is entitled to recover money damages for any injuries he has suffered as a result of the agents' violation of the Amendment. [*Id.* at 395, 397, 91 S.Ct. at 2004, 2005.]

Appellees in the instant case likewise stated a cause of action in tort stemming from a violation of their Fourth Amendment rights by the appellant officers. The fact that they seized appellees' property while acting within the scope of their employment does not exonerate them from liability. Money damages were accordingly an appropriate remedy upon finding that appellees' rights had been violated.

■ "It is a first principle that liability in tort is several, not joint, however many participate in inflicting the wrong and whether they act separately or in conjunction." *McKenna v. Austin*, 77 U.S.App.D.C. 228, 231, 134 F.2d 659, 662 (1943) (footnote omitted); *accord*, W. Prosser, *supra*, § 46, at 291–92, and § 47, at 296; 2 S. Williston, Law of Contracts § 338A, at 714–16 (3d ed. W. Jaeger 1959); 86 C.J.S. *Torts* § 34, at 949 (1954). Although other officers besides appellants participated in the seizure of appellees' property, appellees were not compelled to make the other officers parties to the action. "[E]ach tortfeasor may be sued severally, and held responsible for the damages he is found to have caused, although other wrongdoers have contributed to it. He cannot compel the plaintiff to make the other [tortfeasors] parties to the action, or complain because they have not been joined . . . ." W. Prosser, *supra*, § 47, at 296–97 (footnote omitted). Thus the fact that Sergeant Stone and the other officers were not parties to the action was no bar to recovery from appellants. There was, in short, no error in the trial court's instruction that appellants were not relieved of responsibility merely because they acted as police officers following the order of a superior when they committed the contested acts.

B. *Belief in the Lawfulness of their Actions*

■ Police officers acting in the scope of their employment are protected by a qualified immunity. In *Wade v. District of Columbia*, D.C.App., 310 A.2d 857, 863 (1973) (en banc), we stated: "when sued [for civil wrongs] the individual police officer has a defense of good faith and reasonable belief in the validity of [his challenged acts] . . . ." The analysis for determination of an officer's civil liability, we indicated, is two-tiered: "The standard governing police

conduct is composed of two elements[;] the first is subjective and the second is objective. Thus the officer must allege and prove not only that he believed, in good faith, that his conduct was lawful, but also that his belief was reasonable." *Id.* at 862 (quoting *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 456 F.2d 1339, 1348 (2d Cir. 1972) (on remand)); *accord Woodward v. District of Columbia*, D.C.App., 387 A.2d 726, 727 (1978). Here the trial court correctly instructed the jury on the standard to apply in judging appellants' conduct.[5] The jury had substantial evidence, including testimony as to the officers' deportment and reckless behavior in appellees' residence and demeanor evidence, upon which to base a judgment that appellants had either lacked the good faith belief that their behavior was lawful, or that such belief was, in the totality of the circumstances, unreasonable. We cannot say, on the evidence adduced in this case, that a reasonable juror could not so find.[6]

### C. Limited "Dominion or Control"

Appellants argue that because they made no personal use of the property and had no authority to return it after it was seized, they should not have been held liable for conversion of the items.[7]

---

**5.** The court instructed the jury, in part, that a police officer is not responsible in a civil action for conversion of property seized in the course of his duty, if he acted in good faith with a reasonable belief in the validity of the search. The question is whether the officer had a good faith belief that his conduct was lawful and whether that belief was reasonable.

 \* \* \* \* \* \*

With regard to their good faith and reasonable belief, they bear the burden of proof by a preponderance of the evidence and you must first judge subjective matters. Was the officer acting in good faith[?] To determine a person's good faith from all of the surrounding circumstances, we can't look into a person's mind to determine what his or her intent might be. But, you may consider any act or omission, which indicates a person's state of mind. As to each individual, you must determine if that individual had a good faith belief that he acted lawfully.

You must then determine objective matters. Was the belief a reasonable one[?] A reasonable belief does not require absolute certainty that the articles fell within categories that might be lawfully seized by an officer. In making a seizure, the officer must have such belief as would cause officers of ordinary prudence and caution to believe that the articles could be lawfully seized.

In other words, did the officers demonstrate circumstances which would justify a failure to mention the goods and cause them to believe that it was lawful to seize those goods, either under the language of the warrant or under the special circumstances, inadvertent discovery[?]

**6.** Appellants cite *Mustola v. Toddy*, 253 Or. 658, 667–68, 456 P.2d 1004, 1009 (1969), as authority for the proposition that for policy reasons, "the tort of conversion [should be confined in scope] to its narrowest possible limits when a police officer in an emergency situation exercises control over the arrestee's property." Thus here, appellants, argue, it was accordingly inappropriate to question their good faith, as they were following the orders of a superior when they participated in the seizure of the goods.

*Mustola v. Toddy* is inapposite. In *Mustola*, a police officer arrested the plaintiff for driving while intoxicated. The officer questioned the plaintiff about his relationship to a passenger whom the officer had determined to be the most sober person in the car. The plaintiff answered the officer ambiguously, and the officer entrusted the car to the passenger. Unknown to the officer until afterwards, the passenger was—apparently—a hitchhiker, whose identity was unknown to the plaintiff. He drove away and, along with the car, was never found. The plaintiff sued the police officer for conversion, and a jury verdict for plaintiff was reversed.

Whereas in *Mustola* the officer was faced with an immediate problem—what to do with the car—here there was no such exigency. Also, in *Mustola*, the facts surrounding the transfer of the car were undisputed. The court stated, "*When the facts are undisputed* it is the court's function to determine as a preliminary matter whether such facts are sufficient to permit the jury to conclude that the defendant's conduct constitutes a conversion." *Id.* at 662, 456 P.2d at 1006 (emphasis added). In this case the facts surrounding the seizure especially with respect to the officers' good faith and reasonableness, were disputed. We find the rationale of *Mustola* unpersuasive, particularly as applied to the facts of this case.

**7.** Appellants also contend that they should not have been found liable for conversion because they did not participate in the seizures of the property. There was, however, adequate testimony from which the jury could reasonably conclude that appellants had participated in the seizures. The contention is thus without merit.

■ "[T]he gist of a claim of unlawful seizure or impoundment *is conversion* or trespass to chattels, *which relates the inquiry to the moment of the taking* .... 'The conversion is complete when the defendant takes, detains or disposes of the chattel.'" *DeKine v. District of Columbia,* D.C.App., 422 A.2d 981, 986 (1980) (quoting W. Prosser, *supra* § 15, at 97) (emphasis added). Prosser states, "Perhaps the most common way in which conversion is committed is by an unauthorized transfer or disposal of the goods to one who is not entitled to them." W. Prosser, *supra* § 15, at 87. It is not a necessary element of the tort that the convertor benefit from his act. *Harrell v. Anderson,* 294 F.Supp. 405, 407 (S.D.Ga.1968); W. Prosser, *supra* § 15, at 84 n.16; 89 C.J.S. *Trover and Conversion* § 3 (1955); *cf. Pan American Petroleum Corp. v. Long,* 340 F.2d 211, 220 (5th Cir. 1964), *cert. denied,* 381 U.S. 926, 85 S.Ct. 1562, 14 L.Ed.2d 684 (1965) ("The convertor may either have actual *or constructive possession* of the property.") (Emphasis added; footnote omitted.)

■ The trial court instructed the jurors that, if they found that appellants had unjustifiably seized the property, "the fact that the property in question may now be held by a person, other than the individuals who are before the Court, does not relieve [appellants] of responsibility. They bear the responsibility for placing it where [appellees] could not obtain it ...." There was no error, we conclude, in this instruction, which fairly indicated that it is the removal of personalty from its rightful possessor, rather than personal benefit by the wrongdoer, which is essential to the tort of conversion.

### D. *Appropriateness of an Action for Conversion*

■ Appellants argue that, as remedies were available to appellees for the return of their property, an action for conversion should not have been allowed. The availability of remedies for obtaining a return of property is not, however, a bar to an action for conversion. First, an action for conversion lies as an alternative to, rather than a substitute for, a suit for the replevin of property. "The essence of conversion is an interference with another's property that is so substantial as to justify treatment as a forced sale of the property." *Horne v. Francis I. duPont & Co.,* 428 F.Supp. 1271, 1275 (D.D.C.1977). A conversion may occur either where a defendant with rightful possession of plaintiff's property wrongfully refuses to surrender it, *id.,* or where, as here, even the defendant's initial possession of the property is wrongful. *See DeKine v. District of Columbia, supra* at 986; W. Prosser, *supra* § 15, at 83–84. Where possession is wrongful *ab initio,* the conversion is complete when the defendant takes, detains, or disposes of the goods, *see DeKine v. District of Columbia, supra* at 986, "and the tort is complete without any demand for the return of the goods." W. Prosser, *supra* § 15, at 84 (footnote omitted).

■ Second, money damages, which appellees would not have obtained through an action for the return of their property, constitute a well-established remedy for Fourth Amendment violations.

Of course, the Fourth Amendment does not in so many words provide for its enforcement by an award of money damages for the consequences of its violation. But "it is ... well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." [*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. at 396 [91 S.Ct. at 2004] (quoting *Bell v. Hood,* 327 U.S. 678, 684 [66 S.Ct. 773, 777, 90 L.Ed. 939] (1964) (footnote omitted)).]

In *Bivens,* the Supreme Court held that in the absence of an explicit congressional declaration confining them to a particular remedy, petitioners who had been injured by a violation of their Fourth Amendment rights could sue in tort for money damages. *Id.* at 397, 91 S.Ct. at 2005. There is no such statutory limitation on actions for conversion in the District of Columbia. Thus appellees were not required to pursue remedies for the return of their property instead

of or prior to bringing this action for conversion.

## IV

Finally, appellants assert that even if they are liable for compensatory damages for the conversion of appellees' property, punitive damages should not have been awarded. Appellants were following the orders of their superior and, they claim, believe that they were legally compelled to obey their superior's orders.

 Punitive damages may properly be awarded "where the act of the defendant is accompanied with fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury." *Franklin Investment Co. v. Homburg,* D.C.App., 252 A.2d 95, 98 (1969) (quoting *McClung-Logan Equipment Co. v. Thomas,* 226 Md. 136, 147, 172 A.2d 494, 500 (1961)); *accord, Franklin Investment Co. v. Smith,* D.C.App., 383 A.2d 355, 358 (1978); W. Prosser, *supra* § 2, at 9–10. Proof of these elements "may be inferred from the acts of the defendant and circumstantial evidence. Such intent is seldom admitted and need not be proved by direct evidence." *Franklin Investment Co. v. Homburg, supra* at 98 (citation omitted); *accord, Franklin Investment Co. v. Smith, supra* at 359.

 Indirect evidence of malice in the instant case included appellant Smith's physical abuse of Haltiwanger, as testified to by both Haltiwanger and Whitehead; and appellees' testimony that both appellants participated in the search in which officers dumped and tracked food and garbage on the floor, threw clothes, books, and records recklessly from their storage places, and ripped apart a couch. "The award of punitive damages is a matter for the trier

of facts." *Franklin Investment Co. v. Homburg, supra* at 98 (footnote omitted). We cannot say on this record that there was insufficient evidence to justify such an award.[8]

*Affirmed.*

HARRIS, Associate Judge, dissenting:

If this case were a sports event, the lead paragraph describing it might read as follows:

> The criminal element today scored a startling victory over a law enforcement team. Juries now are free to decide whether police officers executing search warrants committed the tort of conversion by taking items of property into official custody, and assess judgments—including punitive damages—if they don't approve of what the officers did.

The reporting of sports, of course, is but a form of history. The majority's opinion, however, establishes precedent. That precedent, in my view, is ominous. In dissenting from an opinion which I consider to be wrong in many respects, I echo the frustration expressed by Justice BRENNAN in his dissenting opinion in *McGautha v. California,* 402 U.S. 183, 249, 91 S.Ct. 1454, 1488, 28 L.Ed.2d 711 (1971), in which he stated: "In my view the Court errs at all points from its premises to its conclusions." That statement, as strong as it is, is inadequate for this case. At the very least, appellate judges out to be willing to set forth the relevant facts with objectivity. Even that modest goal is not met here.

## I

The majority opinion's statement of the facts is notable for its omissions, making it necessary to fill in the gaps. The majority correctly states that appellants Smith and

---

8. Appellants rely on the case of *Mendes v. Johnson,* D.C.App., 389 A.2d 781 (1978) (en banc), as justification for their assertion that because they "clearly believe that they were legally compelled to obey their superior's orders," an award of punitive damages was not justified. In *Mendes,* an award of punitive damages was not permitted for a self-help eviction where a landlord "might have assumed, on the basis of prior case law, that his conduct was permissible." *Id.* at 793. In *Mendes,* we found lacking in the record sufficient evidence of malice to outweigh the landlord's good-faith reliance on prior case law. Here, appellants did not rely on prior law in acting; moreover, there is adequate evidence to support a finding of malicious and willfully wrongful behavior.

Granville are police officers who received information from a reliable informant that appellee Whitehead was dealing in heroin in his apartment, and that the informant had personal knowledge that Whitehead would exchange heroin for either cash or valuable items of personal property.[1] However, the majority omits the fact that the informant identified for the officers specific types of property that Whitehead would accept in exchange for drugs, namely, televisions, radios, stereo equipment, "or anything that would be movable property." This omission allows the majority to draw its conclusion that the officers had no reason to believe that the items seized were evidence of criminal activity. In fact, there was "a logical nexus ... between the items in question and [Whitehead's] criminal behavior." *United States v. Williams*, 623 F.2d 535, 536 (8th Cir.), *cert. denied*, 449 U.S. 954, 101 S.Ct. 359, 66 L.Ed.2d 218 (1980).

Moreover, based on what they had been told by the informant, the officers carefully evaluated which items to seize and which to leave behind. Illustratively, a vacuum cleaner—which appellee Haltiwanger claimed to own—was not seized. Detective Burke, who was at the scene, discussed taking it with Sergeant Clinton Stone, who directed the search. They determined that it was a common household item. Addition-

ally, "[t]he reason the property was not taken, partially, was that we felt that it was probably not the type of property someone would use to pawn for the purchase of drugs." In contrast, Burke observed that a sewing machine is the type of item that someone might pawn.[2]

In its description of the search, the majority correctly notes that the officers, upon entering the apartment found Whitehead standing in the bathroom. A packet of heroin lay near the toilet, and a loaded gun was found in the bathtub. The majority also mentions—as though a heroin dealer's response to such a question should be binding on the police—that at that point Whitehead told the officers that they had recovered all the narcotics. The majority fails to state that Sergeant Stone then ordered a thorough search of the premises, and that the further search turned up additional heroin and related narcotics paraphernalia.[3]

The majority stays faithful to appellees' self-serving version of the incident throughout, including their testimony as to the manner in which the search supposedly was conducted. The opinion completely ignores the testimony of every officer on the scene which disputed appellees' characterization of the events. Moreover, the majority makes no reference to the severe impeach-

1. As noted, the affidavit in support of the search warrant did not include the informant's tip that appellee Whitehead would accept personal property in return for heroin. The officers decided not to include this information in their affidavit in order to protect the identity of the informant. The officers testified that the omission of such information from an affidavit is not uncommon as long as the affidavit otherwise supports a determination of probable cause. Officer Granville stated that if the affidavit had included that information, "it would tend to pin the informant down. Like, for instance, if there was only one person taking property to the premises, then, naturally, if it was incorporated into the affidavit and the person read the affidavit, then that would be known." It long has been recognized that an informant is entitled to the protection of anonymity so long as the magistrate issuing the warrant is satisfied that probable cause exists. *See McCray v. Illinois*, 386 U.S. 300, 311, 87 S.Ct. 1056, 1062, 18 L.Ed.2d 62 (1967); *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965); *Aguilar v.*

*Texas*, 378 U.S. 108, 114, 84 S.Ct. 1509, 1513, 12 L.Ed.2d 723 (1964).

The very existence of the search warrant distinguishes this case from cases such as *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), upon which the majority places such reliance.

2. In this connection, I find it peculiar that the majority places emphasis on the fact that none of the items seized was listed on the police "hot sheet" of stolen goods. This isolated fact has virtually no significance, since the police were looking not for stolen goods but for evidence of narcotics transactions.

3. Since the items sought (narcotics and paraphernalia) were small, the search was no more intrusive then necessary. "[T]hey might have been hidden in any area of the residence where the items that were in fact seized were found." *Vorhauer v. United States*, 426 F.Supp. 839, 842 (E.D.Pa.1976).

ment of appellees. Whitehead was impeached with prior convictions of false pretenses and narcotics violations; Haltiwanger was impeached with prior convictions of narcotics possession, unlawful entry, possession of implements of a crime, possession of stolen mail, uttering, and violation of probation.

It is clear that the majority thinks little of the officers' reasons for seizing the particular items which they did in the course of the search. The opinion is quite one-sided on the facts. A number of factors led Sergeant Stone to believe that the property should be seized as likely evidence of narcotics dealing, particularly: (1) the informant's notification that Whitehead was accepting such items of personal property in exchange for heroin; (2) Whitehead's inability to give Stone a satisfactory explanation or proof of lawful ownership of the goods at the time of the search and seizure;[4] (3) the ready observation by Stone that some of the items seized were duplicative of other items found in the apartment; and (4) an apparent incongruity between the nature and abundance of the items seized and the relative overall modesty of most other aspects of appellees' living quarters. Based upon his seasoned appraisal of these factors (he had ten years' police experience), Sergeant Stone ordered the times to

be taken down to the police truck. It is unclear which officers actually carried the property downstairs (Detective Burke was listed on police records as the seizing officer at the scene); appellant Smith acknowledges having helped carry some of it. The items were taken directly to the Sixth District headquarters, and later were turned over to the Metropolitan Police Department's property clerk, who still retains possession thereof.

Appellee Whitehead was convicted of possession of narcotics with intent to distribute and receiving stolen property (the gun). He was sentenced to one year's imprisonment. After his release, he sought to have the property clerk return the seized property to him. A hearing was conducted at Whitehead's request. The property clerk, however, refused to return the property to Whitehead absent "satisfactory evidence" of lawful ownership. See D.C. Code 1973, § 4–156(a). When Whitehead was unable to provide such evidence, the property clerk continued the hearing to permit Whitehead to secure proof of ownership.[5] At the second hearing, Whitehead again failed to produce proof of ownership of any of the items.[6] Consequently, the property clerk retained custody over the items. Whitehead and appellee Haltiwanger then initiat-

---

4. For example, Stone stated: "I asked Mr. Whitehead who the movie projector belonged to in the living room, and he informed me that a guy brought it there and dropped it off for him to hold. I asked him who the man was and he said he didn't know. I asked him where the man lived, he said he didn't know. I asked him who the television belonged to in the living room, he said he didn't know."

5. Property Clerk Douglas Cissel suggested a number of ways in which Whitehead could establish ownership, such as providing cancelled checks, microfilmed bank records, receipts, or other verification from stores where he had purchased the items. As to items which Whitehead claimed that he had received as gifts, Cissel stated that he would accept notarized statements from persons indicating that they had given the items to him as gifts. "It doesn't have to say the serial numbers, but such and such a date during such and such a period in the year June 1972 or '73 or '71. 'I gave Noble Whitehead one color t.v. model number, make Zenith, for his birthday.'" At trial, Cissel emphasized that his requirements

for proof of ownership are not stringent. "When something is taken as suspected proceeds of a crime, all I require is some type of common sense proof. If they say a friend gave it to them, all I want is that friend to say, 'Yes, I gave it to him,' that's all."

6. Sometime between the property clerk hearings and the trial on appellees' conversion complaint, Whitehead located a receipt for one of the movie projectors, which he produced at trial. He stated, however, that he had not requested another hearing before the property clerk in order to produce the receipt and recover the projector. Additionally, Rozinni Russel, a friend of Whitehead's, testified at trial that he had given Whitehead a 35-millimeter camera and a tripod. Whitehead had not asked Russel to testify to that effect before the property clerk at the time of those hearings. Asked if he had a receipt for the purchase of those items, Russel stated that he once had a receipt but that he had torn it up about a week before the trial.

ed a civil suit against the two appellant police officers for conversion.[7]

## II

In its lengthy effort to justify its conclusion that the actions of appellants constituted actionable conversion, the majority acknowledges but attaches no significance to one substantial error committed by the trial court (*see ante* at p. 348 n.4) and overlooks another error of law which the trial court committed.[8] It submitted to the jury as questions of fact the issues of (1) whether appellants lawfully had seized the various items of property, and (2) whether actionable conversion had taken place. The trial court in this case should have concluded that the officers' conduct in seizing items from appellees' apartment in the course of a search pursuant to a valid warrant was not conversion as a matter of law. The issue never should have gone to the jury.

In order to establish the tort of conversion, a plaintiff must show an unlawful exercise of ownership, dominion, or control over the plaintiff's personal property in de-

nial or repudiation of the plaintiff's right to such property. *See Blanken v. Harris, Upham & Co.*, D.C.App., 359 A.2d 281, 283 (1976); *Shea v. Fridley*, D.C.Mun.App., 123 A.2d 358, 361 (1956). Such an interference must be so substantial as to justify treatment as, in effect, a forced judicial sale of the property to the converter. *See Horne v. Francis I. duPont & Co.*, 428 F.Supp. 1271, 1275 (D.D.C.1977); W. Prosser, The Law of Torts § 15, at 80–81 (4th ed. 1971). Thus an interference with the property of another cannot amount to a conversion unless that interference is unlawful.

I need not deal with the issue of whether the seizures in this case were constitutionally permissible when measured against the customary Fourth Amendment standards.[9] Even assuming arguendo that they were beyond the scope of the warrant, what took place was not conversion as a matter of law. At no time did appellants exercise ownership or dominion and control for their own benefit of the property seized from appellees. As officers seizing items pursuant to a search warrant, they acted on behalf of

---

**7.** Neither appellee aggressively pursued the customary remedies for obtaining the return of seized property. Appellee Haltiwanger never applied to the property clerk for the return of her claimed property. She testified that she had expected Whitehead to take care of this for her since she was incarcerated on charges of possession of stolen mail, uttering, and violation of probation at the time Whitehead instituted his proceedings before the property clerk. Although entitled to de novo review by the trial court of the property clerk's determination with respect to the property, *see Carroll v. E. Heidenheimer, Inc.*, D.C.Mun.App., 44 A.2d 71 (1945), appellee Whitehead eschewed such a remedy in favor of suing Officers Smith and Granville.

**8.** There is yet another ground for reversal in this case which the majority ignores. While I do not deal with the issue of the propriety of punitive damages as awarded by the jury upon finding appellants to be liable, I do not consider malice to be a relevant factor in reviewing the actions of police officers acting within the scope of their official duty in any event. Rather, I agree with the jurist who noted in another context: "[T]he law regards the doing of the duty and not the motives from or under which it is done .... Does an action lie against a man for maliciously doing his duty? I am of

the opinion that it does not." *Spalding v. Vilas*, 161 U.S. 483, 496, 16 S.Ct. 631, 636, 40 L.Ed. 780 (1896), quoting *Dawkins v. Lord Paulet*, L.R. 5 Q.B. 94, 114. In any event, the evidence admitted by the court principally to prove malice—that is, the testimony by appellee Haltiwanger that she was propositioned by appellant Smith on occasions subsequent to the search—was totally immaterial with respect to motive at the time of the search. At no time did the trial court weigh the probative value of the evidence (obviously none) against its clearly prejudicial nature. *See Punch v. United States*, D.C.App., 377 A.2d 1353, 1358 (1977), *cert. denied*, 435 U.S. 955, 98 S.Ct. 1586, 55 L.Ed.2d 806 (1978). The admission of the testimony, over repeated objection, was therefore an abuse of discretion which calls for reversal.

**9.** I do note, however, that as best I can determine from the record on appeal, the validity of the search has not been challenged successfully. *Cf. Curley v. Bryan*, 362 F.Supp. 48, 51–52 (D.S.C.1973) (where alleged illegal search had never been found to be illegal by any court, and the only court which had ruled on the issue at least inferentially found the search to be proper, and where prisoners' convictions stood undisturbed, the prisoners were not entitled to recover monetary damages from the officers who conducted the search).

the court which authorized the warrant. "The seizing officer claims no right in or to the property, or in or to its possession, save and except as the court may find use for it." *Wilson v. United States*, D.C.App., 424 A.2d 130, 134 (1980), quoting *People v. Superior Court*, 28 Cal.App.3d 600, 609, 104 Cal.Rptr. 876, 883 (1972), quoting in turn *Gershenhorn v. Superior Court*, 227 Cal. App.2d 361, 366, 38 Cal.Rptr. 576, 579 (1964). Accordingly, it is totally inappropriate to impose the legal fiction of a "forced judicial sale" on appellants whose control, if any, over the property was momentary and who never retained it for any purpose.[10] Nor did appellants ever have the requisite intent to support a finding of conversion, that is, the intent to exercise ownership, dominion, or control over the property. *See* Prosser, *supra*, at 83. Rather, they intended merely to seize evidence on behalf of the court for possible use in a criminal prosecution. That intent supplies the legal justification which takes their actions outside the scope of tortious conversion.[11] Since it is the trial court's function as a preliminary matter to determine whether the facts are sufficient in a given case to permit the jury to conclude that a defendant's conduct constituted an act of conversion, *Mustola v. Toddy*, 253 Or. 658, 662, 456 P.2d 1004, 1006 (1969), the trial court's failure in this instance to conclude that conversion had not occurred as a matter of law was erroneous.

### III

With respect to the lawfulness of the seizure, the trial court instructed the jury, in pertinent part, as follows:

> As a matter of law, a police officer is privileged to seize all of the property which is covered by the language of a

duly authorized search warrant. A police officer is also entitled to seize other property which is discovered during a lawful search, if the property is evidence which has a connection or nexus to criminal behavior as an instrumentality of the crime, the fruit of crime such as stolen goods, a weapon by which escape could be affected, and if the property is inadvertently discovered.

> \* \* \* \* \* \*

> If you find that the seizure was not lawful, the plaintiff has proved by a preponderance of the evidence that it was not lawful, you must go on to determine whether the officers, the defendants in this case, have proved by a preponderance of the evidence that they acted in good faith with the reasonable belief that their conduct was lawful, either under the warrant or under circumstances in which they inadvertently discovered evidence during the execution of the warrant.

> \* \* \* \* \* \*

> If you find these officers inadvertently discovered evidence with a nexus to criminal activity during the execution of a valid search warrant, your duty would be at an end and you would return a verdict for each of the defendants.

> If, however, you find that the plaintiff has proved by a preponderance of the evidence that the seizure was not unlawful, you would go on to consider whether the officers acted in good faith with a reasonable belief that their conduct was lawful.

The trial court thus correctly perceived that a determination of appellants' potential liability necessitated a two-tiered analysis: (1) whether the seizure of the items

---

**10.** The seized items were turned over immediately to the property clerk of the Metropolitan Police Department, who is insulated by law from liability in damages for his actions with respect thereto. *See* D.C. Code 1973, § 4–156(c). As noted, appellees failed to exhaust their civil remedies for securing the return of the property. *See* note 7, *supra*.

**11.** I agree with the court in *Mustola v. Toddy*, 253 Or. 658, 668, 456 P.2d 1004, 1009 (1969), that the scope of the tort of conversion should be confined to its narrowest possible limits

when a police officer in an emergency situation exercises control over an arrestee's property. An emergency situation exists whenever, as a practical matter, there is a danger that suspected evidence of a crime may be moved or destroyed (a very real possibility where, as here, not all of the parties at the scene of the crime are arrested) or where investigation permissibly leads officers to evidence in plain view. *See* Hoopes, *The Proposed Good Faith Test for Fourth Amendment Exclusion Compared to the § 1983 Good Faith Defense: Problems and Prospects*, 20 Ariz.L.Rev. 915, 937 (1978).

was lawful and (2) if not, whether the officers acted in good faith with a reasonable belief that the seizure was lawful. The court also correctly noted that if the officers' conduct were determined to be lawful, then that would end the matter. The trial judge's misstep was her failure to recognize that the threshold determination—whether appellants acted lawfully in executing the warrant—was for her to make.

In the absence of any factual dispute of significance between the parties, the validity of the search—that is, whether the items properly were seized pursuant to the search warrant or whether there was probable cause to seize them in any event—was a question of law for the court and not for the jury to determine. *See Prieto v. May Department Stores Co.*, D.C.App., 216 A.2d 577, 578 (1966); *State v. Miller*, 112 Ariz. 95, 537 P.2d 965, 967–68 (1975) (en banc); *State v. Spillars*, 280 N.C. 341, 351, 185 S.E.2d 881, 888 (1972); *State v. Williams*, 157 Conn. 114, 117, 249 A.2d 245, 247 (1968), *cert. denied*, 395 U.S. 927, 89 S.Ct. 1783, 23 L.Ed.2d 244 (1969); *People v. Sherman*, 251 Cal.App.2d 849, 852, 60 Cal.Rptr. 198, 200 (1967).[12]

The trial court erred in this case, therefore, in allowing the jury to determine whether appellants' actions in seizing the goods during the execution of the search warrant were constitutionally impermissible. That determination was a legal one to have been made by the trial court, and only if it were resolved against the officers should the issues of good faith and reasonableness have been submitted to the jury as questions of fact. As I have noted, my colleagues in the majority share this view (*see ante*, at 348 n.4), but they cavalierly substitute their judgment on the seizure issue for the one which erroneously was submitted to and made by the jury. The majority then treats the rest of the case as intact and unaffected by the error, notwithstanding the fact that the jury's improper

consideration of the narrow legal issue undoubtedly was tainted by the inflammatory testimony of appellees—all of which was irrelevant to the legal question—as to the manner in which they claimed the search was conducted. I cannot share in that reasoning.

## IV

Finally, I am troubled by the majority opinion's mixing of the quite different concepts of the suppression of evidence and an act of conversion. The majority opinion reads in major part as though this were an exclusionary rule case rather than a conversion case. With its heavy reliance on suppression cases, the majority opinion portends the ominous result that when a motion to suppress evidence is granted on the ground that a search was conducted unlawfully, that search could give rise to an action in conversion against the officers who conducted it.[13] That result could have a devastating impact on the ability—and even the willingness—of officers to function effectively.

For all of the foregoing reasons, I dissent from the majority opinion, which if permitted to stand could have a devastating impact on law enforcement in this jurisdiction. Because the facts in this case do not support a finding that conversion occurred as a matter of law, I would reverse and remand with instructions to enter judgment in favor of appellants.

Before: NEWMAN, Chief Judge; KELLY, KERN, NEBEKER, HARRIS, MACK, FERREN, PRYOR, and BELSON, Associate Judges.

## ORDER

On consideration of appellants' petition for rehearing and/or rehearing en banc and of appellees' opposition filed with respect thereto, it is

ORDERED that appellants' petition for rehearing is denied; it appearing that the majority of the judges of this Court has

---

12. The pertinent facts in this case are not in dispute. The only factual discrepancy regarding the alleged conversion involves the question of whether both appellants actually took part in carrying the property out of the apartment to the police vehicle. This issue has no bearing on the lawfulness of the seizure.

13. Even that urgent concern may be unduly optimistic, since it does not appear that a motion to suppress was granted in this case (and I see no conceivable basis for such a ruling).

voted to grant appellants' petition for rehearing en banc, it is

FURTHER ORDERED that the aforesaid petition for rehearing en banc be granted and that the opinions and judgment of September 10, 1981, be vacated. It is

FURTHER ORDERED that the Clerk shall schedule this matter for argument before the Court sitting en banc as soon as the business of the Court permits. Counsel are hereby directed to provide ten copies of the briefs heretofore filed to the Clerk on or before Monday, February 1, 1982.

PER CURIAM.